Dorothy **BANNERMAN** and Willie Mae McGovern, Individually and on behalf of all others similarly situated, Plaintiffs,

v.

**DEPARTMENT OF YOUTH AUTHORI-TY,** Allen F. Breed, Individually and in his official capacity as Director of the Department of Youth Authority, Al Owyoung, Individually and in his official capacity as Chief of the Division of Personnel Management, Webster Williams, Individually and in his official capacity as Program Manager for Talliver Community Center, Nita Ashcroft, May Layne Davis, Samuel V. Leask, Robert M. Wald and Frank M. Woods, Individually and in their official capacity as Members of the State Personnel Board, Richard L. Camilli, Individually and in his official capacity as Executive Officer of the State Personnel Board, Defendants.

No. C–73–1377–WWS.

United States District Court,
N. D. California.

Aug. 31, 1977.

Curtis G. Oler, San Francisco, Cal., for plaintiffs.

Evelle J. Younger, Atty. Gen., Harold W. Teasdale and Charlton G. Holland, Deputy Attys. Gen., San Francisco, Cal., for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

SCHWARZER, District Judge.

This action came on for trial before the Court on June 30 and July 6 and 7, 1977. The complaint charges that the Department of Youth Authority (DYA) and the State Personnel Board (SPB), and various employees of those agencies, engaged in unlawful employment practices by discriminating against plaintiffs on the basis of sex in hiring for the position of Parole Agent I, in violation of Section 703(a)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a)(1), and the Civil Rights Act of 1871, 42 U.S.C. § 1983. Plaintiffs attack the following practices of defendants: (1) the requirement of a written test for the position of Parole Agent I; (2) the procedure for oral interviews; (3) the former practice of hiring for Parole Agent I from male-only or female-only lists of applicants; (4) the awarding of veterans' preference points to increase the oral interview scores; and (5) the preferential use of promotional lists to make appointments. In addition to these charges, plaintiff Bannerman, who was hired by DYA, alleges that she was harassed and given negative performance evaluations, and that she was not allowed to apply for the position of Parole Agent III because of her sex.

## I. The Screening and Evaluation Process Used By Defendants

### A. Testing and Interviewing

In order to obtain a pool of qualified candidates for the position of Parole Agent I, SPB administers a written examination approximately every two years. Applicants receiving a passing score of 70 on the written test become eligible for an oral interview, conducted by a Qualifications Appraisal Panel (QAP). A passing score on the interview is a prerequisite for consideration for employment. The QAPs for the relevant periods consisted of a representative from SPB, a representative from DYA, and a person from the community knowledgeable about the qualities desirable in an applicant for the position of Parole Agent I. In addition to applying certain general criteria to be used in evaluating applicants for a variety of positions, the QAPs for the Parole Agent I position were instructed to judge each applicant in relation to the critical class requirements of that position. These requirements were as follows:

(a) Demonstrated interest in working with youths and the rehabilitation of delinquent youths,

(b) Demonstrated ability to relate to youths and to gain their respect and confidence,

(c) An awareness of the street environment,

(d) Acceptance of the various racial, ethnic, and cultural differences existing in every community, and

(e) Ability to make independent decisions and to take effective action, particularly in emergency situations.[1]

Each QAP member rated the applicants according to the enumerated criteria, assigning a score ranging from 70 to 100 to passing applicants and a uniform score of 65 to failing applicants.

Upon completion of the oral interviews, SPB placed those applicants who passed the interview on one of four open lists, depending upon the geographical area from which they applied. Separate lists were main-

---

1. A validation study conducted by SPB in June, 1975, concluded that the critical class requirements positively correlated with the actual on-the-job skills needed by a Parole Agent I.

tained for Northern California, the San Francisco Bay Area, Southern California, and Los Angeles County. Applicants were ranked on the lists according to the scores received on the oral interview alone, the written test score having been used solely for the purpose of qualifying an individual to take the oral interview. The rankings of veterans were raised by the addition of a 10 point veterans' preference (15 points in the case of disabled veterans) to their oral interview scores.

## B. *Results of Tests and Interviews*

At issue here are the 1971 and 1973 examinations and interviews. The 1971 written examination for Parole Agent I was taken by 492 persons, of whom 314 were males and 178 females. A total of 440 passed, with 276 males (87.9%) and 164 females (92.1%) passing. Of those passing, 362 took the QAP interviews, and 306 were placed on the open list. Of the 238 males who were interviewed, 200 (84%) were placed on the open list. Of the 124 females interviewed, 106 (85.5%) were placed on the open list.

In 1973, 407 males and 207 females took the written examination. Of the 614 persons who took it, 347 passed, with 218 males (53.5%) and 129 females (62.3%) passing. Oral interviews were given to 271 persons, and a total of 189—132 men (79%) and 57 women (54.8%)—were found eligible and placed on the open list.

## C. *Hiring*

DYA did not hire applicants directly from the regional open lists. When positions became available, DYA requested SPB to prepare a certification list of the top applicants. A certification list contained the names of any employee of DYA eligible for promotion to Parole Agent I, as well as the names of the top-ranking applicants from the applicable open list. In filling positions, DYA gave preference to promotional candidates over all outside applicants on the open list, even when the promotional candidate scored lower on the oral interview than the other applicants.

It was the practice of DYA until February, 1972, to hire from male-only or female-only certifications, depending upon the particular type of Parole Agent I position available. Sex-segregated certifications were used when DYA anticipated that the parole agent would deal primarily with parolees of his or her own sex. The number of male parolees has always far exceeded the number of females; consequently, fewer positions became available through female-only than male-only certifications. The use of these segregated lists was discontinued in 1972.

Until 1973, DYA used the "rule of three persons" to select candidates from the certification lists. SPB listed the candidates on the certifications in the order of the scores they received on the oral interview. DYA could then hire any of the three top-ranked applicants. If all three were uninterested or unavailable for the job, the next highest applicant on the certification list who was available and interested could be hired. In 1973, DYA adopted the "rule of three ranks." Under this rule, scores from the oral interview were rounded to the nearest whole percent, and all candidates achieving that score were placed in the same rank. Certifications listed the names of all persons in the top three ranks, and an additional number of lower-ranked persons depending on hiring needs. DYA's hiring supervisors had discretion to select from among candidates in the top three ranks, but could not hire from lower ranks until the top three ranks had been exhausted.

## II. *Treatment of Plaintiffs*

### A. *Hiring From the 1971 Open List*

Turning to the particular situations in which plaintiffs Bannerman and McGowen claim to have experienced sex discrimination, Mrs. Bannerman took and passed the written examination for Parole Agent I in 1971, and was then interviewed by a QAP composed of one woman, Betty Lankford, and two men, J. D. Embree and Kenneth Smith. Mrs. Lankford assigned Bannerman a score of 85, while Embree gave her a 78,

and Smith an 80, for an average score of 81. Bannerman was interviewed on September 15, 1971, and on that day a man received the lowest score of the six applicants interviewed by Bannerman's QAP. Bannerman's score of 81 placed her 40th out of 61 candidates on the SPB San Francisco Bay Area open list effective October 12, 1971. If veterans' point preferences had not been given to veteran applicants, Bannerman would have ranked 37th on that list.

Shortly after the 1971 open list was published, Bannerman was hired from a female-only certification for a permanent part-time position and began work on November 29, 1971. On December 4, 1972, Bannerman was hired for a limited term full-time position in San Francisco, but she returned to part-time status on August 1, 1973. She served in that capacity until she was promoted to a full-time permanent position on June 1, 1977, having become eligible for promotion through four years of service.

Mrs. McGowen took and passed the same 1971 written examination for the position of Parole Agent I. On September 23, 1971, she was interviewed by the QAP, which in her case also consisted of Lankford, Embree, and Smith. She received a score of 84 from Lankford, 80 from Embree, and 89 from Smith, for an average score of 84.33. Of the five applicants interviewed that day, McGowen received the third highest average score. The score of 84.33 was sufficient to rank her 32nd on the San Francisco Bay Area open list for October, 1971. If veterans' preference points had not been added to scores, she would have ranked 30th.

McGowen's name did not appear on the various certifications which were issued during the period for part-time or limited term full-time positions (while the names of other women did appear). Although the record is not entirely clear on the matter, it appears from a preponderance of the evidence that McGowen had indicated a desire to be employed on a full-time permanent basis only and for that reason was omitted from other certifications. Accordingly, the Court concludes that Mrs. McGowen has no claim based on defendants' failure to employ her in anything other than a permanent full-time position.

In the following paragraphs, the Court analyzes the employment of men from the 1971 San Francisco Bay Area open list in the light of plaintiffs' charges.

Thirteen men and one woman were hired as Parole Agent I from certifications prepared on the basis of the 1971 Bay Area open list. Of the men, eleven were appointed to permanent full-time positions (Johnson, Hayes, Reddick, Koga, Nakamura, Moore, Abercrombie, Lockwood, Kennen, Bacon, and Clark). Four of these were appointed from male-only certifications (Johnson, Bacon, Hayes, Reddick, and Moore), two from a promotion list (Hayes and Clark), and five received veterans' points (Johnson, Reddick, Koga, Bacon, and Clark). In only one case (Bacon) did the application of these procedures (promotional preference, male-only certification or veterans' preference) result in the hiring of an applicant who ranked below either plaintiff on the open list.

Jewel Bacon had an interview score which, before the addition of veterans' points, ranked him below Bannerman and McGowen. With the addition of veterans' points, his score was higher than plaintiffs' scores. Hence, even had the certification been a combined male-female list, Bacon would have ranked ahead of plaintiffs by reason of his status as a veteran. The validity of Bacon's hiring, therefore, turns on the lawfulness of the veterans' preference, which is discussed below. Each of the other male applicants who were hired had interview scores which, without regard to veterans' points or promotional preference, caused them to be ranked substantially above plaintiffs. Accordingly, plaintiffs have no basis for complaint concerning those cases unless the ranking process itself was discriminatory, a question which will be discussed below.

In addition, two men were hired for limited term positions as Parole Agent I. Rodger LaFleur was first hired for a full-time, nine-months limited term position on No-

vember 1, 1971, from a male-only certification. That certification appears to have been prepared from a list other and earlier than the 1971 open list since none of the names on the latter appears on the former. Hence it appears that plaintiffs were not applicants when this certification was prepared and therefore have no claim.

LaFleur was again hired in May, 1972, for a full-time, twelve-months limited term position. He was hired from a male-female certification which, for the reasons stated, did not include McGowen's name. Bannerman ranked fifth behind LaFleur who was third. LaFleur received veterans' points; without them, Bannerman would have ranked higher than LaFleur. Thus, the validity of the veterans' preference is at issue here.

LaFleur was again hired in May, 1973, for a full-time, two-months term position. At that time, Bannerman held a full-time, limited term position with DYA. Neither plaintiff has a claim based on this employment. Accordingly, the only possible claim arising from the employment of LaFleur concerns the use of the veterans' preference to give LaFleur an advantage over Bannerman in obtaining the May 1972 position.

The other male hired for a limited term position was Cleothis Simmons. He was hired in February, 1972, from a certification on which he ranked ahead of Bannerman, having received a higher interview score. The only claim possible respecting Simmons concerns the process by which applicants were ranked. Simmons was again appointed to a limited term position in January, 1973, at which time Bannerman held a full-time position with DYA.

## B.  *Hiring From the 1973 Open List*

In order to provide opportunities for new applicants, SPB prepared new open lists in 1973, superseding the 1971 lists. Bannerman took the 1973 written test for Parole Agent I but did not pass it and thus did not proceed to the oral interview phase of the selection process. She therefore has no claim except to the extent it may be based on the written examination. McGowen took and passed the 1973 written test and

received a score of 98 from the QAP, placing her in the fourth rank on the 1973 open list. As stated above, beginning in 1972, SPB prepared certification lists according to the rule of three ranks, rather than three persons. If the veterans' preference point system had not been in effect, McGowen would have been in the second rather than the fourth rank. She claims that the veterans' preference and the promotional preference operated in a sex-discriminatory fashion to prevent her from being hired. Thus, it is necessary to examine the impact of those practices upon the hiring which took place from the 1973 open list.

Four men were hired from that list, two of them for full-time permanent positions (Watkins and Campagna). Watkins received a promotional preference. Without it he would have been ranked sixth, behind McGowen who was in the fourth rank. But even if Watkins had not received the preference and been left in the sixth rank, there were three ranks ahead of Bannerman from which in the normal course the appointment would have been made under the rule of three ranks. However, the man in the first rank (St. Cyr) received veterans' preference points; without them, he would have ranked seventh, behind McGowen. The validity of Watkins' employment, therefore, turns not on the promotional preference but on the veterans' preference which caused McGowen to be excluded from the first three ranks. The other man hired (Campagna) ranked ahead of McGowen without the benefit of any preference.

Two men were hired for limited term appointments (St. Cyr and Taylor). St. Cyr, as stated above, ranked ahead of McGowen by virtue of veterans' preference points. Taylor was tied with McGowen in the fourth rank and received no preference. The record shows that Taylor had prior experience as a Parole Agent I on a temporary basis which warranted his employment ahead of McGowen.

## III.  *The Validity of the Evaluation Procedure*

■ Plaintiffs charge that the use of written and oral tests to qualify applicants for Parole Agent I results in sex-based dis-

crimination. Title VII forbids the use of employment tests which are discriminatory in effect. Once the complaining party has made out a prima facie case of discrimination by showing that the particular tests select candidates in a sex pattern significantly different from that of the pool of applicants, the burden shifts to the employer to show that a given requirement has a manifest relationship to the employment in question. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The threshold question, then, is whether plaintiffs have sustained their burden of showing that the written test and the oral QAP process result in a significantly lower percentage of women eligible for the position of Parole Agent I.

McGowen and Bannerman cannot complain that as to them the 1971 written test had a discriminatory effect. Both passed the test and, overall, a higher percentage of women taking the test passed than men. The test is given on a pass-fail basis so scores have no significance. In 1973, Bannerman failed the written test, but it is impossible to conclude that the failure was the result of sex bias in the examination, inasmuch as once again a higher percentage of women than men passed the test.

Both plaintiffs claim that the 1971 oral interview process had a discriminatory effect, alleging that, although a higher percentage of women passed the interview than men, their scores and resulting rankings were so low as to give them little chance of being hired. Although the provisions of Title VII did not become applicable to public employers until March 24, 1972, the rankings derived from the 1971 oral interview panels were used to make hiring decisions until 1973. Thus, any sex discrimination arising from the 1971 oral interview is subject to the prohibitions of Title VII since the "relevant aspects of the decision-making process had undergone little change" after March 24, 1972. *Hazelwood School Dist. v. United States*, —— U.S. ——, 97 S.Ct. 2736, 2742 n. 15, 53 L.Ed.2d 768 (1977); see also, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977).

Plaintiffs presented expert testimony to support the charge that the interview process had a discriminatory impact on women applicants. The expert testified, first, that women generally obtained significantly lower scores than men, which is explained in part by the fact that the benefit of veterans' preference points generally went to men and improved their ranking. The validity of the veterans' preference is discussed in the following section.

Plaintiffs' expert further testified that women on the San Francisco Bay Area open lists obtained significantly lower scores than men even when veterans' preference points were eliminated. At the same time, however, he found that women on the Los Angeles list received higher scores than men and that no significant sex-based differences appeared on other lists.

The statistics are based on a sampling which reflects not only the scores given by the particular QAPs that interviewed in the area covered by the list but also scores of candidates who transferred to the list form other areas. Thus, the sample used is not an accurate reflection of the ratings produced by the San Francisco or any other particular QAP panel. Moreover, the results distilled by plaintiffs' expert do not demonstrate the presence of any inherent sex bias in the process.

This conclusion is reinforced by the findings of defendants' expert to the effect that, in connection with the 1971 interviews: (1) there was no statistically significant difference between the pass rates of males and females interviewed by the QAPs; (2) there was no statistically significant difference in scoring by male and female panel members; (3) there was no correlation between the sex of the panel members and the total scores assigned by a particular panel; (4) there was a high degree of correlation of the scores given an applicant by the different panel members; (5) there was no statistically significant difference between scores received by males and scores received by females from a panel; (6) there was no correlation between the sex of the applicant and whether an appli-

cant ranked above or below the median score; and (7) there was no correlation between sex and obtaining a passing grade on the interview.

The Court concludes that plaintiffs have failed to establish that the interview process is discriminatory. The process itself is facially neutral. Both men and women are on the interview panels. The questions asked and criteria applied by the panel were validated by an independent study conducted by SPB in 1975, which produced the critical requirements for the Parole Agent I position. The result of the interviews, which may favor women in one case and men in another, do not establish either the existence of a discriminatory effect or a pretextual arrangement.

The Court therefore finds that the 1971 oral interview process did not result in discrimination against plaintiffs on the basis of sex. Nor can plaintiffs complain of the 1973 QAP interviews. Bannerman was not eligible for the oral interview, not having passed the written test. McGowen, who would have placed in the second rank if the award of veterans' preference points had not moved her to the fourth rank, cannot contend that the 1973 interview process was sex-biased or had the effect of discriminating against her on the basis of sex, in view of the high ranking she in fact achieved.

In addition to the Title VII attack on the written and oral tests, plaintiffs claim that the process used to select candidates for Parole Agent I position unconstitutionally discriminates against women in violation of 42 U.S.C. § 1983. The process used to select candidates is neutral on its face. The only aspect of the process which classified applicants on the basis of sex—the use of male-only and female-only certifications—did not have an adverse impact upon these plaintiffs, as shown above, and was discontinued in 1972. The analysis to be applied to facially neutral, job-related tests was set forth in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), where the Court held that the discriminatory impact of a facially non-discriminatory employment test used by the District of Columbia Police Department did not establish a constitutional violation in the absence of evidence of a discriminatory intent. From the record here, the Court is unable to discern any evidence of discriminatory intent in the Parole Agent I testing procedures. Indeed, the QAPs were admonished not to discriminate on the basis of sex in their judgment of applicants. *Washington v. Davis* counsels trial courts to regard the totality of the relevant facts, including the disproportionate impact of the law or practice on one race, or sex, in judging whether an invidious discriminatory purpose can be inferred from a facially neutral practice. Considering all of the evidence here, no such purpose can be inferred.

IV.   *The Veterans' Point Preference*

As may be seen from the facts found above, the award of veterans' preference points adversely affected the ranking of both Bannerman and McGowen in 1971, and that of McGowen in 1973. Pursuant to California Government Code § 18973, a veteran, as defined in that section, or the widow or widower of a veteran, is allowed a credit of 10 points to the passing score he attains in an entrance examination for a civil service position. Veterans' points may be used not to attain the passing score, but only to enhance the rank achieved by an eligible veteran candidate. The veterans' preference statute is neutral on its face in that it applies equally to male and female veterans. Nevertheless, the Court may take judicial notice of the fact that, in practical effect, the benefits of the veterans' preference are available more frequently to male applicants, since males have served in the armed forces in disproportionately greater numbers than females. This is reflected in the conclusion which plaintiffs' expert drew from his study of the results of the open list in both 1971 and 1973 that when veterans' points were counted, the differences between the scores of men and women were statistically significant.

Plaintiffs are precluded from attacking the veterans' preference under Title VII since Section 712, 42 U.S.C. § 2000e–11, provides that Title VII shall not be construed to repeal or modify federal, state, or local laws creating special rights or prefer-

ences for veterans. They do attack the preference under Section 1983, however, relying on *Anthony v. Massachusetts*, 415 F.Supp. 485 (D.Mass., 1976) (three-judge court), appeal docketed *sub nom., Massachusetts v. Feeney*, 45 U.S.L.W. 3163 (U.S. Aug. 23, 1976, No. 76–265).[2] In *Anthony*, the majority sustained plaintiff's attack on the Massachusetts statute which gave veterans an absolute preference over other applicants, holding that it discriminated against women in violation of the equal protection clause of the 14th Amendment. The court made clear at the outset that it found the Massachusetts statute to have been enacted not for the purpose of eliminating women from civil service positions but for the legitimate purposes of encouraging military service and easing the transition from military to civilian life. Relying upon the disproportionate impact on women civil service applicants, however, the court analyzed the discriminatory effect upon women in light of Supreme Court opinions which require a convincing factual rationale for sex-based classifications, and found that the Massachusetts preference could not survive that scrutiny. See, e. g., *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975), cited by the court in *Anthony*.

Thus, the *Anthony* case rested its holding entirely upon the reasoning that a state statute which is discriminatory in its impact upon women may violate Section 1983 even though the law is neutral on its face and enacted without discriminatory intent. This approach was rejected in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), decided shortly after *Anthony*, wherein the Court made legislative intent the crucial factor in discrimination cases. Plaintiffs in *Washington* were black District of Columbia police officers and applicants for that position who challenged on equal protection grounds the literacy test for police officers. At trial, plaintiffs proved that black officers and applicants failed the test in proportionally greater numbers than did white applicants, but the District Court held that the disproportionate impact alone did not warrant a finding that the test was discriminatory. The Supreme Court, reversing the Circuit Court and affirming the District Court, held that discriminatory impact standing alone is insufficient to invalidate a law or practice without proof that the law or practice was designed so to discriminate. Moreover, the Court held that discriminatory impact alone did not prove an intent to discriminate where the law or practice is neutral on its face.[3]

The record is this case reveals no evidence of any intent to discriminate underlying the California veterans' preference system. As other courts have stated, veterans' preference statutes have as their purpose the rewarding of veterans who have served their country and, recognizing that military experience may enhance a candidate's qualifications, the easing of their re-entry into the civilian job market. *See, Feinerman v. Jones*, 356 F.Supp. 252 (M.D.Pa.1973) (three-judge court) (Pennsylvania statute awarding 10 point bonus upheld against equal protection challenge by women applicants); *Branch v. Du Bois*, 418 F.Supp. 1128 (N.D.Ill.1976) (three-judge court). Indeed, as stated above, the *Anthony* court recog-

---

**2.** The Supreme Court has since certified to the Supreme Judicial Court of Massachusetts the question whether the state attorney general could bring the appeal without the consent of the state officials who were the named defendants. 429 U.S. 66, 97 S.Ct. 345, 50 L.Ed.2d 225 (1976). *Anthony v. Massachusetts* is analyzed in Note, *Veterans' Public Employment Preference as Sex Discrimination*, 90 Harv.L.Rev. 805 (1977).

**3.** *Washington v. Davis, supra*, requires a showing of intent to determine whether a statute neutral on its face may be found to discriminate on the basis of *race*. The Court did not

address in that case the question of sex discrimination. Given the fact that race classifications are subject to strict scrutiny and must be justified on the basis of a compelling state interest, while sex classifications are examined under a less searching standard, the showing of intent would have to be at least as substantial as *Washington v. Davis, supra*, requires for a race case. In *Branch v. Du Bois*, 418 F.Supp. 1128 (N.D.Ill., 1976) (three-judge court) the Illinois veterans' preference law was upheld against challenge by women on a finding that there was no intent to discriminate, applying the *Davis* case.

nized the valid, non-discriminatory purposes of the Massachusetts veterans' preference law. The crucial difference between the facts of that case, and those presented here, is that the Massachusetts system awarded an absolute preference to any veteran passing the entrance examination, no matter how low his score might be in comparison with other applicants. The opinion of Judge Tauro, writing for the *Anthony* court, strongly emphasized the absolute nature of the preference, as did the concurring opinion of Circuit Judge Campbell, 415 F.Supp. at 501. Both opinions suggest that a less than absolute preference might pass constitutional muster. Thus, even if intent to discriminate could be inferred from the type of preference given by Massachusetts, such a result would not follow here where the preference is limited to 10 points added to a passing score. Absent a finding of legislative intent to discriminate, plaintiffs' claim with respect to the veterans' preference system must fail under *Washington v. Davis, supra.*

### V. *Promotional Preference and Male-Only Certification*

Under the practices of SPB, any DYA employee eligible for promotion to Parole Agent I was placed ahead of all other candidates on the certification list, regardless of score. As the foregoing analysis shows, under the circumstances of this case, that preference did not have an adverse effect on either plaintiff. It is not necessary, therefore, to pass on its lawfulness. Similarly, the use of male-only certifications, until they were discontinued in 1972, had no impact on plaintiffs here inasmuch as they failed to result in the hiring of men with lower scores than plaintiffs.

### VI. *Bannerman's Other Claims*

■ In addition to her claims based upon the discriminatory impact of the hiring process, Bannerman alleges that she was discriminated against on the basis of her sex during her employment as Parole Agent I. She claims that her male supervisors gave her negative performance evaluations, that she was followed by her supervisors, that her office was bugged, and that she was prevented from taking the examination for Parole Agent III. Bannerman's testimony with respect to each of these claims was contradicted by her supervisors, who testified that they never evaluated her performance on the basis of sex nor harassed her in the manner she alleges. Bannerman filed a charge relating to these claims with the EEOC. The Commission investigated and found no evidence of discrimination. The Court finds that the evidence presented by defendants is more credible than that of Bannerman, and accordingly concludes that plaintiff has not sustained her burden of proof on these issues.

The foregoing constitutes the Court's findings of fact and conclusions of law.

For the reasons stated above, the Court finds and concludes that judgment should be entered in favor of defendants on all claims of both plaintiffs, and that each party shall bear its own costs.

IT IS SO ORDERED.