Helen B. FEENEY

v.

The COMMONWEALTH OF MASSACHUSETTS et al.

Civ. A. No. 75–1991–T.

United States District Court, D. Massachusetts.

May 3, 1978.

Richard P. Ward, Ropes & Gray, John Reinstein, Boston, Mass., for plaintiff.

Thomas Kiley, First Asst. Atty. Gen., Boston, Mass., for defendants.

John J. Curtin, Jr., John F. Adkins, Bingham, Dana & Gould, for amicus curiae, the American Legion.

Before CAMPBELL, Circuit Judge, MURRAY, Senior District Judge, and TAURO, District Judge.

## OPINION

TAURO, District Judge.

By order of remand from the Supreme Court, we have been instructed to reconsider our decision in *Anthony v. Commonwealth*,[1] 415 F.Supp. 485 (D.Mass.1976), in light of the Court's subsequent decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976).[2] After further briefing and oral argument, we conclude that *Davis* does not require us to alter our original holding. To the contrary, we have determined that both *Davis* and the Court's later opinion in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), support our conclusion that the challenged Massachusetts Veterans' Preference statute[3] deprives women of equal protection of the laws and, therefore, is unconstitutional.[4]

### I

## THE *ANTHONY* DECISION

The broad issues in this case are treated extensively in our prior opinion. 415

---

1. This case, originally entitled *Anthony v. Commonwealth*, was brought as two separate actions under 42 U.S.C. § 1983 by four Massachusetts women challenging the Veterans' Preference stat..te, Mass.Gen.Laws ch. 31, § 23. The plaintiffs in *Anthony* were three non-veteran women, admitted to the Massachusetts bar, who had applied for positions as counsel to state agencies. Plaintiff Feeney, in a separate suit, sought an administrative post in the civil service. The two suits were consolidated. We determined that the claims brought by the plaintiffs in *Anthony* were rendered moot by passage in April, 1975 of Mass.Gen.Laws ch. 31, § 5, which removed all appointments for state and municipal legal positions from the provisions of the state civil service law. We considered plaintiff Feeney's claim on the merits. Our decision in the *Feeney* case is the subject of the court's remand order presently before us.

2. Also before the court is plaintiff's motion to amend the complaint to add a cause of action challenging the Veterans' Preference Act as violative of the Equal Rights Amendment to the state constitution, ratified in November, 1976, several months after our original opinion had issued. Plaintiff's motion raises several important issues, namely whether an amendment to the complaint would be within the scope of the Court's order of remand, whether the doctrine of abstention would require us to certify plaintiff's claim to the Massachusetts Supreme Judicial Court, and whether we would be obliged to consider the state claim prior to reaching the federal constitutional issue in this case.

Plaintiff asserts as a basis for the motion that, in the event her federal claims are rejected, she may be estopped from bringing a separate suit based on the state claim. At oral argument, however, the Commonwealth stipulated that it would not seek to raise the defense of estoppel with respect to plaintiff's state claim should there be a subsequent proceeding in the state court. Having in mind the Commonwealth's stipulation, we deny plaintiff's motion to amend. Fed.R.Civ.P. 15(a).

3. Mass.Gen.Laws ch. 31, § 23.

4. In *Anthony,* we enjoined enforcement of the Massachusetts Veterans' Preference statute, Mass.Gen.Laws ch. 31, § 23, because it deprived women of equal protection under the law. The state subsequently filed a motion for relief from judgment, urging reconsideration in light of *Davis*. That motion, along with a motion for relief from judgment pursuant to Fed.R.Civ.P. 60(b)(6), was denied, although a stay pending appeal was granted. The stay was rendered moot by the passage of an interim statute, Stat.1976, c. 200, which suspends operation of the challenged statute pending the outcome of this case on appeal. The interim statute is presently in effect and provides a modified point preference for veterans.

F.Supp. 485. In order to put in context our reconsideration of *Anthony*, however, it is useful to outline briefly some of its major points.

The statutory scheme challenged in *Anthony* established a formula that permanently prevents a non-veteran from achieving a place on the civil service appointment list ahead of a veteran, regardless of comparative test scores.[5] We pointed out that "(a)s a practical matter . . . the Veterans' Preference replaces testing as the criterion for determining which eligibles will be placed at the top of the list." 415 F.Supp. at 489.

The selection formula, geared as it is to veteran status, is necessarily controlled by federal military proscriptions limiting the eligibility of women for participation in the military. Long-standing federal policy limited to 2% the number of women who could participate in the armed forces. *Anthony v. Commonwealth, supra,* at 489. Traditionally, enlistment and appointment criteria have been more restrictive for women than for men.[6] An inevitable consequence of this federal policy limiting women's participation in the military is that only 2% of Massachusetts veterans are women. *Id.*

(T)he practical consequence of the operation of these federal military proscriptions, in combination with the Veterans' Preference formula is inescapable. Few women will ever become veterans so as to qualify for the preference; and so, few, if any, women will ever achieve a top position on a civil service eligibility list, for other than positions traditionally held by women.

*Id.* at 490.

We recognized that the prime legislative motive of the challenged statute, that of rewarding public service in the military, was worthy. *Id.* at 496. But we also observed that

(i)t is not enough that the prime objective of the Veterans' Preference statute . . . is legitimate and rational. The means chosen by the state to achieve this objective must also be legitimate and rational.

*Id.* at 497.

We determined that the means chosen by the Massachusetts Legislature to reward veterans were not grounded "on a convincing factual rationale." *Id.* at 495. We pointed out that the challenged statutory formula was not an effort by the state to set priorities for finite resources; that there were less drastic alternatives available to the state, such as a point system; and that any argument attempting to relate the challenged formula to job performance or qualification was "specious." *Id.* at 495–499. We concluded that the formula relegated job-related criteria and professional qualifications to a secondary position. *Id.* at 497.

■ Moreover, we emphasized that the challenged preference was absolute and permanent. No time limit was imposed or attempt made "to tailor its use to those who have shortly returned to civilian life." *Id.* at 499. Such a broad-brush approach may be administratively convenient, but mere administrative convenience is not a legitimate basis for benefiting one identifiable class at the expense of another. *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

Although the Veterans' Preference statute was not designed for the sole purpose of

---

**5.** An applicant who passes the civil service written examination becomes an eligible and is placed on an "eligible list" under the following ranking formula:

    1. Disabled veterans in order of their composite scores.

    2. Other veterans in order of their composite scores.

    3. Widows and widowed mothers of veterans in order of their composite scores.

    4. All other eligibles in order of their composite scores.

Mass.Gen.Laws ch. 31, § 23; *Anthony v. Commonwealth,* 415 F.Supp. 485, 488 (D.Mass. 1976).

    The full statutory procedure by which eligible applicants are certified and selected is set forth in our original opinion. 415 F.Supp. at 488–90.

**6.** A complete summary of the limitations placed on women seeking entry into the armed forces is set forth in our earlier opinion. 415 F.Supp. at 489–90.

subordinating women, *Anthony v. Commonwealth, supra,* at 495, its clear intent was to benefit veterans even at the expense of women. As we stated.

> (T)he formula's impact, triggered by decades of restrictive federal enlistment regulations, makes the operation of the Veterans' Preference in Massachusetts anything but an impartial, neutral policy of selection, with merely an incidental effect on the opportunities for women.

*Id.* at 495.

Rather, we found the preference formula to be

> a deliberate, conscious attempt on the part of the state to aid one clearly identifiable group of its citizens, those who qualify as veterans, . . . at the absolute and permanent disadvantage of another clearly identifiable group, Massachusetts women.

*Id.* at 496.

The consequences of adopting a permanent absolute preference formula tied to federal enlistment restrictions were more than predictable, they were inevitable.

## II

### THE IMPACT OF *DAVIS* ON *ANTHONY*

At issue in *Davis* was a pre-employment literacy test used by the District of Columbia police department. The district court rejected plaintiffs' allegation that the test was "culturally slanted" to favor whites. It determined further that the test was "reasonably and directly" related to the requirements of the police recruit training program, although unrelated to actual job performance. 426 U.S. at 235, 96 S.Ct. 2040. The D.C. Circuit reversed, holding irrelevant the failure of plaintiffs to allege and prove discriminatory intent in the exam's design and administration. It determined that the disproportionate percentage of blacks who had failed the exam sufficed to establish a constitutional violation. *Id.* at 236–37, 96 S.Ct. 2040.

In reversing the court of appeals, the Supreme Court stated that claims of invidious discrimination under the fifth or fourteenth amendments require proof of a discriminatory purpose. A facially neutral statute may not be deemed vulnerable to equal protection challenge solely because it has a disproportionate impact. The Court emphasized that discriminatory intent need not be "express or appear on the face of the statute," 426 U.S. at 241, 96 S.Ct. at 2048, but that consideration must be given to the totality of the circumstances. Disproportionate impact is one such highly relevant circumstance we must consider.

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact . . . may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

426 U.S. at 242, 96 S.Ct. at 2048. *See also Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). This point was amplified by Justice Stevens in his concurring opinion.

> Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. This is particularly true in the case of governmental action which is frequently the product of compromise, of collective decisionmaking, and of mixed motivation.

*Id.* at 252, 96 S.Ct. at 2054 (Stevens, J., concurring). *See also Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (Stevens, J., concurring).

A major factor distinguishing *Davis* from the case at hand is the nature of the selection procedure challenged in each case. Although the plaintiffs in *Davis* originally challenged the entire District of Columbia police recruitment scheme, the sole issue before the Supreme Court was the validity of the written civil service test. *Washington v. Davis, supra* 426 U.S. at 233–35, 96 S.Ct. 2040.

The district court in *Davis* determined that the challenged test was neutral on its face. *Id.* at 235, 96 S.Ct. 2040. This determination apparently provided a basis for the Court's statement that,

> A rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far-reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more bur-

densome to the poor and to the average black than to the more affluent white. *Id.* at 248, 96 S.Ct. at 2051. (Footnotes omitted.)

The factual underpinning in this case is entirely different. As we have already emphasized, the Veterans' Preference statute is "anything but an impartial, neutral policy of selection with merely an incidental effect on the opportunities for women." 415 F.Supp. at 495. Here, plaintiff does not challenge the civil service written examination but, rather, the overriding ranking formula that mandates an absolute job preference to veterans over non-veterans, regardless of comparative test scores. This preference formula effectively "replaces testing as the criterion for determining which eligibles will be placed at the top of the list." *Id.* at 489.

In analyzing the "totality of the relevant facts" so as to determine the legislative intent underlying the challenged statute, we must of necessity examine official acts or policies to determine whether they had the natural, foreseeable and inevitable effect of producing a discriminatory impact.[7] *See Washington v. Davis, supra,* 426

---

7. Defendants assert that a "foreseeability test" violates the mandate in *Davis.* Specifically, defendants rely on the Court's remand in *Austin Independent School District v. United States,* 429 U.S. 990, 97 S.Ct. 517, 50 L.Ed.2d 603 (1977), for the proposition that "inferences about intent flowing from arguably foreseeable consequences is not a substitute" for inquiry into specific intent. Defendants' Reply Brief at 7.

An order of remand is ambiguous in import. Justice Powell's concurrence suggests the remand in *Austin* may have been prompted by the breadth of the remedial relief ordered. 429 U.S. at 991, 992, 97 S.Ct. 517. *See also School District of Omaha v. United States,* 433 U.S. 667, 97 S.Ct. 2905, 53 L.Ed.2d 1039 (1977); *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). We will not presume that the Court utilized a remand order in *Austin* to abrogate the basic precept that a person is deemed to intend the natural, probable and foreseeable consequences of his actions. Nothing in *Davis* would indicate rejection in equal protection cases of this long-standing principle. *See Arthur v. Nyquist,* 429 F.Supp. 206, 210 (W.D.N.Y. 1977). Indeed, the Court recognized the dif-

ficulty of direct proof of intent, stating that the discriminatory purpose need not be express or appear on the face of the statute. 426 U.S. at 241, 96 S.Ct. 2040. Moreover, Justice Stevens' concurrence suggests that this precept has continued vitality. *Id.* at 253, 96 S.Ct. 2040 (Stevens, J., concurring).

Defendants cite two cases where the "foreseeability test" was considered and rejected. *United States v. City of Chicago,* 549 F.2d 415 (7th Cir. 1977); *Guardians Ass'n of the New York City Police Dep't v. Civil Service Comm'n,* 431 F.Supp. 526 (S.D.N.Y.1977). These cases are clearly distinguishable. In both, the challenged procedures were found to be neutral. Here, we have determined the challenged statutory scheme to be "anything but an impartial, neutral policy of selection." 415 F.Supp. at 495.

We do not hold that in all cases a plaintiff may attempt to circumvent the intent requirement of *Davis* solely by presenting proof of foreseeability of impact. We are dealing here with a statute that is not facially neutral. Moreover, it has an inevitable discriminatory impact on a clearly identifiable class. These are relevant factors to consider in determining underlying legislative intent.

U.S. at 253, 96 S.Ct. 2040 (Stevens, J., concurring); *N.A.A.C.P. v. Lansing Board of Education,* 559 F.2d 1042 (6th Cir. 1977).

The legislature was, at the least, chargeable with knowledge of the long-standing federal regulations limiting opportunities for women in the military,[8] and the inevitable discriminatory consequences produced by their application to the challenged formula.[9]

> In practical application, the combination of federal military enrollment regulations with the Veterans' Preference is a one-two punch that absolutely and permanently forecloses, on average, 98% of this state's women from obtaining significant civil service appointments.

*Anthony v. Commonwealth, supra,* at 498.

We must also assume that the legislature was cognizant of the fact that the stringent entry criteria embodied in the federal military regulations bore "no de-monstrable relation to an individual's fitness for civilian public service." *Id.* at 498–99. We realize that a due process or equal protection claim is not to be judged by the standards applicable under Title VII. *Washington v. Davis, supra,* 426 U.S. at 239, 96 S.Ct. 2040. Our holding that the Massachusetts civil service selection process is unconstitutional is not based solely on the fact that it bears no relationship to job performance. But the fact that the criteria set forth in the challenged statutory formula fail to measure job performance is one additional circumstance bearing on the question of discriminatory intent.[10]

Finally, the statistical evidence presented by plaintiff demonstrates a pattern of exclusion of women from the civil service.[11] At the time the suit was filed, only 2% of Massachusetts veterans were women.[12] Although 43% of the civil service appointees were women, a large percentage of them

---

8. *See Anthony v. Commonwealth,* 415 F.Supp. 485, 489–90 (D.Mass.1976).

9. The legislative history does suggest an awareness on the part of the lawmakers of the predictable discriminatory impact the preference formula would have on women. Until 1971, most of the veterans' preference statutes and civil service regulations included provisions approving the practice of requisitioning only female applicants for certain positions. Jobs for which women were requisitioned were exempted from operation of the statute. *See* Mass. Gen.Laws ch. 31, § 23 (1966); Acts 1922, ch. 463; Acts 1919, ch. 150, § 2; Acts 1895, ch. 501, § 2. Although the 1895 statute on its face appears to exempt women from the operation of the veterans' preference with respect to all available jobs, the prior and subsequent legislative history suggest that the statutory language was merely consistent with the pre-existing rule permitting single sex lists. See Civil Service Rule XIX(3) promulgated pursuant to Stat. 1884, ch. 320. If a request were made for a female applicant, the Commissioner had no authority to certify a male for the position, regardless of his veteran status. Op.Att'y Gen. 68 (1941). In 1971, the legislature repealed this statutory exemption. Acts 1971, ch. 219.

   Statistics show that the exemption operated only to preserve stereotypically "female" clerical jobs for women. *See* 415 F.Supp. at 488. Contrary to defendants' assertion, elimination of this exception did not remove the last vestiges of sex discrimination from the statutory scheme; it only served to make all positions in the civil service subject to the overriding pref-erence formula. *See* Comment, *Veterans' Public Employment Preference as Sex Discrimination,* 90 Harv.L.Rev. 805, 812 (1977); Fleming and Shanor, *Veterans' Preferences in Public Employment: Unconstitutional Gender Discrimination?,* 26 Emory L.J. 13, 53 (1977).

10. It is significant to note that the Court in *Davis* adopted the finding of the district court that the challenged test "directly related to the requirements of the police training program." 426 U.S. at 235, 96 S.Ct. at 2045.

11. Plaintiff argues that this statistical presentation of itself creates a presumption of purposeful discrimination, thereby shifting the burden of proof to defendants. *See Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977); *Washington v. Davis,* 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). In view of our subsidiary and ultimate findings and conclusions, based on an uncontradicted record, concerning the existence of discriminatory intent, we conclude that plaintiff has met her burden of proof without the benefit of a presumption and, therefore, find it unnecessary to address this procedural issue.

12. At oral argument the parties stated that there is no reason to revise the agreed statement of facts submitted in *Anthony.*

   Moreover, there is no reason to assume that the facts have changed measurably, inasmuch as the challenged statute has not been in effect due to passage of the interim point preference statute. *See* n. 2, *supra.*

served in lower grade positions for which men traditionally did not apply. Of the women appointed over a ten year period, from July 1, 1963 through June 30, 1973, only 1.8% were veterans, while 54% of the men had veteran status. 415 F.Supp. at 488.

The facts demonstrate that this absolute job preference formula had a devastating impact on the plaintiff's attempts to advance her position in the civil service. In 1971, she received the second highest test score for the position of Assistant Secretary to the Board of Dental Examiners, but was ranked sixth on the list of eligibles, behind five male veterans, four of whom had received lower scores. She was not certified and a male veteran with a lower examination score was appointed.

Two years later when she applied for another administrative post, plaintiff received the third highest mark on the exam, but only ranked fourteenth on the list, behind twelve male veterans, eleven of whom had lower test scores. Again, plaintiff was not certified for appointment. The third time she applied for an administrative position, plaintiff received a score that would have placed her within the top twenty places on the eligibles list. By operation of the formula, however, she was ranked 70th on the list, behind 50 male veterans with lower test scores. *Id.* at 497–498.

These figures, and others cited in our earlier opinion,[13] show a clear pattern of exclusion of women from competitive civil service positions. Unlike the defendants in *Davis*, the Commonwealth has not made any showing of affirmative efforts to recruit women, or of a recent rise in the percentage of women appointed to competitive civil service positions. In *Davis* the district court found that 44% of the new police recruits over the preceding three years had been black, a figure roughly approximating the proportion of blacks in the area. That court also found that the Department had "systematically and affirmatively sought to enroll black officers, many of whom passed the test but failed to report for duty." 426 U.S. at 236, 96 S.Ct. at 2045.

The situation here is in marked contrast. The Commonwealth's proffered 57–43 ratio of men to women is misleading. A large percentage of female appointees serve in lower grade permanent positions for which males traditionally have not applied. Some women received their appointments through a now defunct practice by which the appointing authorities would requisition only women applicants for certain jobs. 415 F.Supp. at 488.[14] While the officials in *Davis* sought "systematically" to recruit minorities who had passed the preemployment test, the defendants here have demonstrated no attempt to mitigate the permanent and absolute impact on women of a formula that systematically excludes them from desirable public service positions even though they have demonstrated their qualifications by passing a written exam.[15] The Commonwealth argues that,

> historical analysis makes it clear that the enactment of this legislation by the General Court was in no way motivated by a desire to discriminate against women. Rather, the legislative motivations for Massachusetts Veterans' Preference statutes were: (1) to reward those who have sacrificed in the service of their country; (2) to assist veterans in their readjustment to civilian life; and (3) to encourage patriotic service.

Brief for Defendants at 24, 25.

We disagree. It is clear that the Commonwealth's motive was to benefit its veterans. Equally clear, however, is that its intent was to achieve that purpose by sub-

---

13. *See* 415 F.Supp. at 488, 491–92, 497–98.

14. *See* n. 10, *supra*.

15. We recognize that "(m)ere absence of recruitment efforts, by itself is not equivalent to an intent to discriminate," *Guardians Assoc. of the New York City Police Dept. v. Civil Service*

*Comm'n*, 431 F.Supp. 526, 535 (S.D.N.Y.1977). We emphasize that our finding of discriminatory intent is not based solely on the Commonwealth's failure to show affirmative efforts to recruit women. This is merely one of the factors we rely on in considering the totality of the circumstances.

ordinating employment opportunities of its women. The course of action chosen by the Commonwealth had the inevitable consequence of discriminating against the women of this state. *See Anthony v. Commonwealth, supra,* at 496. The fact that the Commonwealth had a salutary motive does not justify its intention to realize that end by disadvantaging its women.

*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the "dominant" or "primary" one.

*Village of Arlington Heights v. Metropolitan Development Housing Corp., supra,* 429 U.S. at 265, 97 S.Ct. at 563. (Footnotes omitted.)

The fact that there are less drastic alternatives available to the state to achieve its purpose of aiding veterans,[16] underscores our conclusion that the absolute and permanent preference adopted by the Commonwealth resulted from improper evaluation of competing considerations. By intentionally sacrificing the career opportunities of its women in order to benefit veterans, the Commonwealth made a constitutionally impermissible value judgment.

We reaffirm our holding that the Massachusetts Veterans' Preference Act denies equal protection under the law and, therefore, is unconstitutional.

LEVIN H. CAMPBELL, Circuit Judge (concurring).

This is not an easy case to deal with under *Washington v. Davis,* 426 U.S. 229, 96

---

16. *Anthony v. Commonwealth,* 415 F.Supp. 485, 499 (D.Mass.1976).

* The statute can be called facially neutral in that it does not make a division based strictly on sex. The law provides employment preference for veterans, not males. While veterans are 98% male, a few veterans are female, and there are many males who are not veterans.

---

S.Ct. 2040, 48 L.Ed.2d 597 (1977). On the one hand, there can be no question about the unequal impact of this law: practically speaking, it permanently shuts off whole areas of state employment to women. On the other hand, as Judge Murray points out in his dissent, a strong initial case can be made for the proposition that it is "neutral on its face," and not motivated in any ordinary sense by a discriminatory intent.* Arguably, therefore, the challenged statute is the kind of law which, notwithstanding its widespread impact on women's employment opportunities, should be upheld as constitutional. The thrust of *Washington v. Davis* and related decisions such as *Village of Arlington Heights v. Metropolitan Housing Corporation,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), is that we must accept that well-intentioned programs may have uneven side effects: society is too complicated for every discriminatory consequence to disqualify legitimate policies. Welfare programs, for example, foreseeably benefit minority groups disproportionately, just as tax deductions do whites. Examinations (as in *Washington v. Davis*) designed reasonably to weed out those unqualified for police work, may eliminate minority applicants more than others. Town and city planning laws, designed to improve community life, may because of separate economic factors, create barriers to minorities. Society would soon be in a state of paralysis if it could adopt only laws having strictly equal impact upon all groups and classes within it.

But while I fully recognize not only that *Washington v. Davis* is the law of the land but also that its principle reflects an essential limitation upon the sweep of the equal protection clause, I do not believe that the Massachusetts veterans preference law ac-

The statute can likewise be said not to be based on a discriminatory intent, in the sense that no one thinks that it was enacted as a pretext to harm women. While the harm to female employment opportunities is extensive and, given the statutory scheme, inevitable, it was not this harm which prompted passage of the law, but rather the entirely justifiable desire to aid individuals who had served their country, often at great sacrifice.

tually falls within its ambit. This, as Judge Tauro convincingly demonstrates, is no ordinary statute having merely an incidental unequal impact. It is a statute which goes a long way towards making upper level state employment a male preserve. Upon close inspection, the seeming "neutrality" of the veterans preference law, and even its seeming absence of intentional discrimination, are both open to serious question.

I turn first to the matter of its neutrality. While the dividing line between veterans and non-veterans is not the same as the dividing line between men and women, the ineluctable effect of this law is to confer an absolute priority upon a class that is 98% male in a sphere of employment where women, generally, should have the same access as men. What the laws does, is to take a group which has, for unique reasons, been selected almost exclusively from the male population (military service being what it was and is), and grant it an absolute preference in an entirely different sphere of public employment where male preference is not only not the rule but is constitutionally impermissible. The law may be "facially neutral" in the limited sense and it is not based overtly on selection by sex, but since the preferred class is 98% male the effect is virtually the same as if it were.

The discriminatory impact in *Washington v. Davis* was far less inevitable: the selection device at issue, a police examination, did not mandate the recruitment of a class made up, overwhelmingly, of whites. While past experience might have indicated that proportionately fewer blacks than whites would pass the neutral examination, this was not an inevitable outcome: a black who was determined to succeed might by dint of extra effort make up for past disadvantages; coaching and recruiting measures, as well as educational and economic improvements, might, over the years, increase the number of successful blacks. No such opportunity exists here for women. The veterans' preference law prefers an already established class which, as a matter of historical fact, is 98% male. Because only persons who have served during war-

time are eligible for the preference, the class cannot be expanded in the near future to include more women. Thus its "neutrality" is at best skin-deep. The law was sexually skewed from the outset, since the exclusionary effect upon women was not merely predictable but absolutely inescapable and "built-in".

This same inevitability of exclusionary impact upon women also undermines the argument of no discriminatory intent. There is a difference between goals and intent. Conceding, as we all must, that the goal here was to benefit the veteran, there is no reason to absolve the legislature from awareness that the means chosen to achieve this goal would freeze women out of all those state jobs actively sought by men. To be sure, the legislature did not wish to harm women. But the cutting-off of women's opportunities was an inevitable concomitant of the chosen scheme—as inevitable as the proposition that if tails is up, heads must be down. Where a law's consequences are *that* inevitable, can they meaningfully be described as unintended? Doubtless the impact of women, if considered at all, was regarded as an acceptable "cost" of aiding veterans. But may society properly elect to aid veterans or any other group at the cost of abolishing equal employment opportunities in a major segment of public employment? In my view, the answer is "no".

This is not to say that society may not bestow benefits upon veterans. But I think it may not construct a system of absolute preference which makes it virtually impossible for a woman, no matter how talented, to obtain a state job that is also of interest to males. Such a system is fundamentally different from the conferring upon veterans of financial benefits to which all taxpayers contribute, or from the giving to them of some degree of preference in government employment, as under a point system, as a *quid pro quo* for time lost in military service. The latter measures do not impose unfairly upon one segment of our society; the instant law, in contrast, forces women to pay a disproportionate

share of the cost of benefiting veterans by sacrificing their own chance to be selected for state employment.

Thus while it is concededly a close question whether the Massachusetts veterans' preference is to be regarded as the sort of neutral classification with unintended effects absolved by *Washington v. Davis*, I feel on balance that it is not. Rather the law is more realistically viewed as substantively non-neutral. The destruction of normal female opportunities in the state employment system is too evident a consequence of the super-imposition of veterans as an absolutely preferred class upon that system. If this can be done constitutionally, the equal protection clause of the Constitution is, in this area of employment, little more than a hollow pretense, whatever it may remain in theory. As I think the unique problem posed in this case is distinguishable from any contemplated in *Washington v. Davis*, I adhere to our former judgment.

FRANK J. MURRAY, Senior District Judge (dissenting).

*Washington v. Davis*, 426 U.S. 229, 239, 242, 96 S.Ct. 2040, 2047, 2049, 48 L.Ed.2d 597 (1977) holds:

. . . [O]ur cases have not embraced the proposition that a law or other official act, without regard to whether it reflects a racially discriminatory purpose, is unconstitutional *solely* because it has a racially disproportionate impact. [Emphasis in original.]

\*  \*  \*  \*  \*  \*

. . . [W]e have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another.

The majority today determines that *Washington v. Davis, supra*, supports their previous holding that the Massachusetts Veterans' Preference statute, Mass.Gen. Laws ch. 31, § 23, deprives women of equal protection of the laws in violation of the Fourteenth Amendment in all areas of civil service employment in the Commonwealth. Although recognizing that "[a] facially neutral statute may not be deemed vulnerable to equal protection challenge solely because it has a disproportionate impact", *ante* at 146, Judge Tauro reaches this determination by finding that "[w]e are dealing here with a statute that is not facially neutral", *ante* at 147, fn. 7, and that it is the Commonwealth's intent to achieve the purpose of benefiting its veterans "by subordinating employment opportunities of its women". *Ante* at 149–150. Judge Campbell concurs in the judgment of unconstitutionality, finding that the inevitability and degree of disproportionate effect make the statute non-neutral and that the inevitability of effect suggests discriminatory intent. With respect, I disagree that these findings and the result reached are demonstrably tenable.

I

The Veterans' Preference statute is not on its face gender-based. *Anthony v. Commonwealth of Massachusetts*, 415 F.Supp. 485, 501 (1976) (Campbell, C. J., concurring). Clearly the statutory "division between veterans and non-veterans is not drawn along sex lines and does not provide for dissimilar treatment for similarly situated men and women. On its face the statute is neutral . . .". *Id.* at 503 (Murray, J., dissenting). Most persons favored by the statutory preference are males, although a substantial number of those not so favored are also males. Non-veteran women in larger numbers share with non-veteran men the disfavor of the statute, but a number of those aided by the statute indeed are women. The statute explicitly includes women in its requirement for service during time of war, but not combat duty. Mass.Gen. Laws ch. 4, § 7, cl. 43; ch. 31, § 21; 1958 Op.Atty.Gen., 25–26. Although in operation it favors males in greater proportion than females for the higher civil service

positions,[1] the statutory classification has not been shown to be a mere pretext to accomplish the purpose of invidiously discriminating against women. *See Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974); *General Electric Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976). Moreover, it is not disputed that the statutory preference was not enacted for the purpose of disqualifying women from receiving civil service appointments. *Anthony v. Commonwealth of Massachusetts, supra* at 495.

The attempted distinction between the test in *Davis* and the statute here is totally unconvincing: one is no more neutral than the other. In each case the classification is facially neutral, and in operation the effects are uneven; the only difference is that the statute here has a weightier impact on the relevant group, and impact alone is not determinative, *Washington v. Davis, supra*, 426 U.S. at 239, 96 S.Ct. 2040.[2]

## II

In *Arlington Heights v. Metropolitan Housing Corp.*, 429 U.S. 252, 264–266, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977), the Court said:

Our decision last Term in *Washington v. Davis*, 426 U.S. 229 [96 S.Ct. 2040, 48 L.Ed.2d 597] (1976), made it clear that official action will not be held unconstitutional solely because it results in a racially disproportionate impact. "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination." *Id.*, at 242, 96 S.Ct. at 2049. *Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.* . . . [Emphasis supplied.]

. . . [I]t is because legislators . . . are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a *proof that a discriminatory purpose has been a motivating factor in the decision*, this judicial deference is no longer justified. [Emphasis supplied.]

The record before the court, to the extent that it provides direct and circumstantial evidence of intent, does not show the operation of the statute and its effect to be a clear pattern, unexplainable on grounds other than an intent to limit the employment opportunities of women. This is so, whether the relevant facts are viewed totally or separately. Conceding the factor of unequal impact and that it was foreseeable, a showing of unconstitutional action has not been made. Even in *Davis* the government officials there might well have foreseen that blacks would not do as well on the test as whites. *See Boston Chapter, N.A.A.C.P. v. Beecher*, 504 F.2d 1017, 1021 (1st Cir. 1974). Awareness on the part of the legislature that disproportionate impact would follow is not enough.[3] Awareness, like

---

1. Unequal treatment of plaintiff's interest in the opportunity for public employment under a statute serving ends otherwise within the power of the state to pursue violates no fundamental interest guaranteed to plaintiff by the federal constitution. *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976). Since the statute here is neutral on its face, and since it is undisputed that the statute was not enacted to harm women, the statutory scheme to benefit veteran men and women in the area of public employment to the disadvantage of non-veteran men and non-veteran women does not offend the equal protection clause of the Fourteenth Amendment.

2. Judge Campbell states this result is an "inescapable and 'built-in'" feature of the law, *ante* at 151. But in weighing his argument that the statute is for that reason, *inter alia*, impermissibly discriminatory against women, it cannot be overlooked that the unfavorable impact of the statute is shared alike by non-veteran women and a large number of non-veteran men.

3. *See* the concurring opinion of Mr. Justice Stewart, joined by Mr. Justice Powell, in *United Jewish Organizations of Williamsburgh, Inc. v. Carey*, 430 U.S. 144, 180, 97 S.Ct. 996, 1017, 51 L.Ed.2d 229 (1977):

That the legislature was aware of race when it drew the district lines might also suggest a discriminatory purpose. Such awareness is not, however, the equivalent of discriminatory intent.

foreseeability, is not proof of discriminatory intent, and other evidence is required. The legislative history of the statute with its unequal impact on women is clearly explainable as having the purpose of preferring qualified veterans for consideration for civil service jobs.[4]

The preference statute is not vulnerable to the claim that discriminatory intent may be inferred because there is no relationship between the preference and job performance. In the first place, the contention of no such relationship is open to dispute, see Feinerman v. Jones, 356 F.Supp. 252, 260 (M.D.Pa.1973), but even if that contention were to prevail, it would bear on intent only if job performance were the only goal the legislature could serve by means of the preference. That is obviously not the case here, for it is in the national interest that enlistment in the armed services be encouraged, see, e. g., H.Rpt. No. 93–857, 93rd Cong., 2d Sess. (1974) (Armed Forces Enlisted Personnel–Bonus Revision Act of 1974), and hiring preferences are well-established means for furthering that purpose. See, e. g., Anthony v. Commonwealth, supra at 496, 497; 42 U.S.C. § 2000e–11.

The statistical evidence presented by plaintiff provides no support for an inference of a discriminatory purpose. This is an impact argument, and Arlington Heights (and Davis) requires proof of intent as "a motivating factor". Plaintiff's systematic exclusion argument analogizes the jury-se-

lection cases, but those cases do not apply in the context of this case. Arlington Heights pointed out that "[b]ecause of the nature of the jury selection task, however, we have permitted a finding of constitutional violation even when the statistical pattern does not approach the extremes of Yick Wo [v. Hopkins, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886)] or Gomillion [v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960)] . . .". 429 U.S. at 266, n.13, 97 S.Ct. at 564.[5] Whatever the exact focus of the Court in jury-selection cases, the Court makes it clear that even in those cases impact alone is determinative only when it emerges as "a clear pattern, unexplainable on grounds other than race", Arlington Heights, supra at 266, 97 S.Ct. at 564. The facts here do not fit into that mold: it is undisputed that the preference here is based on a determination to help veteran men and women and not non-veterans.

Plaintiff's reliance on Castaneda v. Partida, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977), is misplaced; Castaneda, which Judge Tauro finds no need to address, ante at 148, n.11, is distinguishable from the case before us. In that case statistics were used to show that the number of Mexican-Americans on certain grand juries normally to be expected, had the jurors been chosen randomly, was so much higher than the actual number of Mexican-Americans called that plaintiff had made out a prima facie case of equal protection violation. The sta-

---

4. The effect of certain statutory enactments would appear to be protective of women. See St.1895, c. 501, § 1 and St.1896, c. 517, § 2. Each sets out details of the preference and concludes: "But nothing herein contained shall be construed to prevent the certification and employment of women." See Opinion of the Justices, 166 Mass. 589, 592–593, 44 N.E. 6251 (1896). The legislature in 1971 revised the provision allowing single sex requisitions, with the result that the number of "women's" jobs protected from the preference was severely limited, but the purpose of the revision would appear to be the prevention of occupational sex discrimination: the statute allows single sex requisitions only after approval has been obtained from the Massachusetts Commission Against Discrimination. Mass.Gen.Laws ch. 31, § 2A(e). See also G. Blumberg, De Facto

and De Jure Sex Discrimination Under the Equal Protection Clause: A Reconsideration of the Veterans' Preference in Public Employment, 26 Buff.L.Rev. 3, 38 (1976–77).

5. The Court may be referring to the difference between an inference of intent from the cumulative impact of a series of administrative determinations and an inference from the impact of a rule promulgated by prior legislative or administrative action, see Shield Club v. City of Cleveland, 14 E.P.D. ¶ 7763 at 5772 (N.D.Oh. 1976); it may be referring to the presumption, more likely in jury cases than in other cases, that the result of selection will be random, see J. Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1263–66.

tistics were presented in the context of the operation of the "key man" system of jury selection, which allows jury commissioners to select jurors from a list on which Spanish surnames are easily identifiable, and the system is thus "susceptible of abuse". 430 U.S. at 497, 484–85, 495, 97 S.Ct. 1272. No evidence was presented by the State, and the Court recognized that there would be no constitutional violation were the State to explain the numerical discrepancy on neutral grounds. As pointed out above, the preference statute is clearly explainable as having the purpose of preferring veteran men and women at the expense of non-veteran men and women.

## III

The principle applied in tort and criminal actions, that an actor is presumed to intend the natural and foreseeable consequences of his deeds, must yield to the entirely different considerations at work when a federal court is addressing an equal protection challenge to state legislation. Principles of federalism involve a "recognition of the value of state experimentation with a variety of means for solving social and economic problems", *Anthony, supra* at 502 (Murray, J., dissenting), and considerations of federalism require that an impermissible motive in enacting state legislation be not lightly inferred. *See* Note, Developments in the Law: Equal Protection, 82 Harv.L.Rev. 1065, 1093–94, n.101; A. Bickel, *The Least Dangerous Branch*, 214; P. Brest, *Palmer v. Thompson* : An Approach to the Problem of Unconstitutional Legislative Motivation, 1971 Sup.Ct.Rev. 95, 129–30. Inevitability of effect, even coupled with disproportionate impact, "absent a pattern as stark as that in *Gomillion* or *Yick Wo*" is not evidence of discriminatory purpose or intent.[6] *See Davis, supra* 426 U.S. at 242, 96 S.Ct. 2040; *Arlington Heights, supra* 429 U.S. at 266, 97 S.Ct. 555. A legislature's choice of preferring veterans implies invidious intent only if it appears inconsistent with expected and valid considerations.[7] In most hiring situations the scores of those certified would likely be very little different were the veterans' preference not in effect.[8] There is here no indication that the legislature de-

---

6. An important point in Judge Campbell's analysis is the following:

> To be sure, the legislature did not wish to harm women. But the cutting-off of women's opportunities was an inevitable concomitant of the chosen scheme—as inevitable as the proposition that if tails is up, heads must be down. Where a law's consequences are *that* inevitable, can they meaningfully be described as unintended?

*Ante* at 151. The answer to his question must be that inevitability of effect is relevant only where it bears on intent, and to find intent as that word is used in *Washington v. Davis* one must find motive. Judge Campbell agrees that "[w]hile the harm to female employment opportunities is extensive and, given the statutory scheme, inevitable, it was not this harm which prompted passage of the law . . .". *Ante* at 150, n.*. Where, as here, a law's consequences were inevitable, but there is no evidence at all that those particular consequences motivated the legislature, they can indeed be described as unintended.

7. *See* P. Brest, *supra*, 1971 Sup.Ct.Rev. at 121–122; Note, *Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction*, 86 Yale L.J. 317, 332–43 (1976).

8. For one of the positions applied for by plaintiff, that of Solomon Head Administrative Assistant, the three applicants certified of whom one would be chosen, had scores of 77.40, 93.28, and 90.20. Without the veterans' preference, the top three scores would have been 94.88, 93.28, and 92.32 (plaintiff). Agreed Statement of Facts (hereinafter "Statement") ¶¶ 12, 13, Exhibits 2, 4. For another position, that of Administrative Assistant, there were seven positions available. Eleven persons would be certified, Statement ¶ 9, and were the top eleven all to indicate interest, the positions would be filled from a group with scores of 88, 86, 86, 84, 94, 92, 92, 92, 90, 90, and 90. Without the preference, the selections would be from a group with scores of 94, 92, 92, 92, 91, 90, 90, 90, 90, 89, and 89. Statement ¶¶ 16, 17, Exhibit 7. For a third position, Assistant Secretary, Board of Dental Examiners, the top three scores were 89.72, 78.08, and 83.64; without the preference, the top three scores would have been 89.72, 86.68 (plaintiff), and 83.98. Statement ¶ 27, Exhibit 61. That the appointee for this position had a score of 78.08, the lowest of the three certified, indicates that there are other important qualifications besides test scores and thus that there is little reason to believe that the quality of the employee pool is significantly lowered by its containing persons with slightly lower test scores than would be present absent the veterans' preference statute.

parted from usual considerations in enacting the preference. To the extent, however, that the legislature wishes to use civil service hiring practices to favor veterans, any effort to diminish the impact on women by diluting the preference necessarily results in a diminution of the benefit to veterans. Because of this nature of the hiring benefit, use of the "absolute" preference instead of a point preference, like the use of any preference at all, provides no ground for indictment of the legislature's motive.

## IV

Since *Washington v. Davis*, three veterans' preference provisions have been subjected to equal protection challenge; all three have been upheld. *Bannerman v. Dept. of Youth Authority*, 436 F.Supp. 1273 (N.D.Cal.1977); *Branch v. DuBois*, 418 F.Supp. 1128 (N.D.Ill.1976); *Ballou v. State, Dept. of Civil Service*, 148 N.J.Super. 112, 372 A.2d 333 (App.Div.1977), aff'd, 75 N.J. 365, 382 A.2d 1118 (1978). Three of the decisions distinguish *Anthony v. Commonwealth, supra*, as having been based on a stronger negative effect on women than those courts faced. The California court, however, states that the approach used in *Anthony* was "rejected in *Washington v. Davis*", *Bannerman*, 436 F.Supp. at 1280. Each court had little trouble in concluding that no intent to harm women was present, even in the "absolute" preference at issue in New Jersey. The Illinois court's language is representative.

> While those who never served in the armed forces, those who served at times not within the statutory periods and women who are not veterans suffer a disadvantage in hiring and promotion, this is an

incidental result of a statute intended to reward veterans and not one intended to discriminate against men and women who are not veterans or those whose service was in times of limited military action. *Branch v. DuBois*, 418 F.Supp. at 1133.[9]

The impact of the statute at issue here does not approach the extremes described in *Arlington Heights, supra* 429 U.S. at 266, 97 S.Ct. 555, and plaintiff must prove intent by other evidence. This she has not done. The question: "Would the veterans' preference statute have been enacted if women were represented in the armed services in such numbers that the preference would have no discriminatory effect?" has not been addressed by plaintiff, and she has given the court absolutely no reason to answer this question in the negative. She has failed to make out a prima facie case of discriminatory intent. *See Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In light of *Washington v. Davis* I would not hold, as the majority does, that the Massachusetts Veterans' Preference statute violates the Equal Protection Clause of the Fourteenth Amendment. I respectfully dissent.

---

9. This court would seem to have agreed in its earlier opinion, where the majority stated that

> [t]he Massachusetts Veterans' Preference was not enacted for the purpose of disqualifying women from receiving civil service appointments.

*Anthony v. Commonwealth of Massachusetts*, 415 F.Supp. 485, 495 (1976).

Nowhere in his opinion has Judge Tauro said that the Massachusetts legislature intended to harm job opportunities for women or that limiting such opportunities was a motive in enactment of the legislation, and that, of course, is precisely what must be shown. All Judge Tauro will say is that the legislature's "clear intent was to benefit veterans even at the expense of women", *ante* at 146. This says nothing about motive and is entirely consistent with a finding that the legislature saw the impact on women as extremely regrettable but unavoidable.