Phillip HARRIS et al., Plaintiffs,

v.

Kevin H. WHITE et al., Defendants.

UNITED STATES of America, Plaintiff,

v.

CITY OF BOSTON et al., Defendants.

Civ. A. Nos. 76–501–N, 76–4216–N.

United States District Court,
D. Massachusetts.

Nov. 2, 1979.

Peter L. Resnik, Shepard M. Remis, James M. Hughes, Herrick D. Smith, Boston, Mass., Mark S. Brodin, Lawyers' Committee for Civil Rights, Boston, Mass., for plaintiffs.

Donald K. Stern, E. Michael Sloman, Alan K. Posner, Asst. Attys. Gen., Boston, Mass., for State defendants.

White & Casazza, Thomas F. McKenna, Jr., Boston, Mass., for City defendants.

Sandra L. Hughes, U. S. Dept. of Justice, Washington, D. C., for Federal defendants.

## MEMORANDUM OF DECISION ON MOTIONS TO DISMISS

GARRITY, District Judge.

Private plaintiffs, two applicants for employment with, and one former CETA-funded employee of, the Boston Public Works Department (hereinafter PWD), bring this class action against various city, state and federal officials seeking declaratory and injunctive relief from employment practices of the PWD. Plaintiffs claim that these practices discriminate against minorities on the basis of race and national origin, denying them equal protection of the laws in violation of the Thirteenth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, 42 U.S.C. § 1981, Title VI and Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000d *et seq.* and 2000e *et seq.*), and the nondiscrimination provision of the State and Local Fiscal Assistance Act of 1972, Section 1242(a)(1) of 31 U.S.C. §§ 1221 *et seq.* (hereinafter Revenue Sharing Act) and its implementing regulations, 31 C.F.R. §§ 51.50 *et seq.* The

jurisdiction of this court is based on 28 U.S.C. §§ 1331, 1343 and 1361. A motion for class certification has been referred to a Magistrate and no decision has yet been made. After the commencement of this action, the United States filed a complaint, *United States v. City of Boston*, C.A. No. 76–4216–G, against city and state officials, claiming violations of the nondiscrimination provision of the Revenue Sharing Act, 31 U.S.C. § 1242(a)(1), and seeking the same relief as that requested by the private parties. A motion to consolidate the two cases, C.A. No. 76–501–G and C.A. No. 76–4216–G, was granted on April 8, 1977.

The state defendants, officials of the Massachusetts Civil Service Commission and Personnel Administrator of the Massachusetts Division of Personnel Administration, moved to dismiss some of the claims of the private parties and, by a separate motion, the claims of the United States. Regarding the claims of the private parties, the state defendants contend that plaintiffs' complaint should be dismissed in certain respects for failure to state a claim upon which relief can be granted, Fed.R.Civ.P., Rule 12(b)(6), and for lack of subject matter jurisdiction, Fed.R.Civ.P., Rule 12(b)(1), because (1) plaintiffs have not met the requirements for unlawful discrimination since they do not allege a racially discriminatory purpose on the part of state officials, (2) plaintiffs do not have standing to challenge employment practices in the official service category for the reason that none of them applied for official service positions, and (3) plaintiffs have failed to allege a violation of the Revenue Sharing Act since their complaint does not claim that the state defendants received revenue sharing funds or that any moneys received by the state funded a program or an activity involved with plaintiffs' allegations of discrimination. The state defendants also moved to dismiss the complaint of the United States, urging the first and third grounds supporting dismissal of the private plaintiffs' complaint, failure to allege intentional discrimination and non-receipt of revenue sharing funds.

This court referred the motion to a Magistrate pursuant to 28 U.S.C. §§ 636 (b)(1)(B), (C), and he recommended that defendants' motions be denied. The state defendants filed timely objections. We have reviewed the Magistrate's recommendations, in light of the objections, and the parties' briefs and for the reasons outlined below we adopt some of the Magistrate's rulings and reject others. In particular, we grant the state defendants' motion to dismiss the private plaintiffs' claims based on the Thirteenth and Fourteenth Amendments, 42 U.S.C. §§ 1981 and 1983, and Title VI, 42 U.S.C. § 2000d, for failure to allege intentional discrimination. We deny state defendants' motion to dismiss the private plaintiffs' Title VII and revenue sharing claims for lack of standing, without prejudice to defendants' renewing their objections in the context of the motion for class certification. And we deny state defendants' motions to dismiss the claims based on the Revenue Sharing Act, 31 U.S.C. § 1242(a).

■ The standard used to evaluate a motion to dismiss for failure to state a claim is a liberal one:

> [A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Conley v. Gibson*, 1957, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80; *O'Brien v. DiGrazia*, 1 Cir. 1976, 544 F.2d 543, 545. But generous interpretation of a civil rights complaint may not supply an essential element of a claim not appearing in the complaint. With this standard in mind, we turn to a discussion of each of defendants' three arguments.

I. *Intent to Discriminate*

■ The requirement of showing purposeful or intentional discrimination as a condition to an equal protection violation had its genesis in the school desegregation cases. *See, Keyes v. School District No. 1*, 1973, 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548. Thereafter the Supreme

Court extended the intent requirement to embrace all claims based on a failure to provide equal protection. *Personnel Admin. of Mass. v. Feeney,* —— U.S. ——, 99 S.Ct. 2282, 60 L.Ed.2d 870, 1979; *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 1977, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450; *Washington v. Davis,* 1976, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597. The reach of the intent requirement, however, is limited. It applies to constitutional claims alleging violations of the Fifth and Fourteenth Amendment's guarantees of equal protection. *Washington v. Davis, supra.* Furthermore, because 42 U.S.C. § 1983 creates no substantive rights but merely authorizes a private cause of action for violations of rights found elsewhere, *Chapman v. Houston Welfare Rights Org.,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508, 1979, intent is most certainly an element of plaintiffs' claim under this section insofar as it seeks to redress violations of the Fourteenth Amendment's equal protection clause.

■ Assuming that there is a private cause of action under Title VI, 42 U.S.C. § 2000d *et seq.* and that exhaustion of administrative remedies is not required, both open questions, *see, University of California Regents v. Bakke,* 1978, 438 U.S. 265, 281–84, 98 S.Ct. 2733, 57 L.Ed.2d 750 (Powell, J., 379–87 (White, J.) and 418–21, 98 S.Ct. 2733 (Stevens, J., joined by Burger, Stewart, Rehnquist, JJ.), plaintiffs must prove intent as an essential element of a claim under this section as well. Five of nine Justices in *Bakke, supra,* explicitly held that Title VI prohibits racial classifications to precisely the same extent as does the Equal Protection Clause of the Fourteenth Amendment. *Bakke, supra,* at 287, 98 S.Ct. 2733 (Powell, J.), 325 (Brennan, White, Marshall, Blackmun, JJ.). The other four justices expressed no opinion on the issue. *Id.,* at 417–18, 98 S.Ct. 2733 (Stevens, J., joined by Burger, Stewart, Rehnquist, JJ.). It follows then from the majority decision in *Bakke* that the *Davis* intent standards apply to Title VI claims.

■ Plaintiffs' claims based on the Thirteenth Amendment and 42 U.S.C. § 1981 must be treated in like manner. Although § 1981, unlike § 1983, is a source of substantive rights independent of the Fourteenth Amendment's Equal Protection Clause, the great majority of courts have incorporated the *Davis* intent requirement into a § 1981 claim, *e. g., Williams v. DeKalb County,* 5 Cir. 1978, 582 F.2d 2, 3 (*per curiam*); *City of Milwaukee v. Saxbe,* 7 Cir. 1976, 546 F.2d 693, 705; *Croker v. Boeing Co. (Vertol Div.),* E.D.Pa.1977, 437 F.Supp. 1188, 1181; and that approach appears to have been adopted by the First Circuit Court of Appeals in *Des Vergnes v. Seekonk Water Dist.,* 601 F.2d 9 at 14, 15–16, 1979. Hence we follow it in this case.

■ However, it is clear that an intent to discriminate is not an element of a Title VII violation, at least one based on a disparate impact theory. *Sweeney v. Board of Trustees of Keene College,* 1 Cir. 1978, 569 F.2d 169, 174–75; *United States v. City of Chicago,* 7 Cir. 1977, 549 F.2d 415, 428, *cert. denied* 1977, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155; *see, International Brotherhood of Teamsters v. United States,* 1977, 431 U.S. 324, 335–36, n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396; *Washington, supra,* 426 U.S. at 238, 96 S.Ct. 2040. And the great weight of authority supports the use of Title VII standards to decide whether there has been "discrimination", as meant by 31 U.S.C. § 1242(a)(1), in a program funded by revenue sharing funds. *City of Chicago, supra,* at 440; *United States v. City of Buffalo,* W.D.N.Y.1978, 457 F.Supp. 612, 619; *see,* 31 C.F.R. § 51.53(b) (1977). Hence neither the complaint brought by the United States nor the private party's claims based on Title VII and 31 U.S.C. § 1242(a)(1) is subject to dismissal solely because of a missing allegation of intentional discrimination.

The United States Supreme Court has elaborated the concept of discriminatory intent in three key opinions, *Washington v. Davis, supra ; Village of Arlington Heights, supra,* and *Personnel Admin. of Mass. v.*

*Feeney, supra.*[1] From these three cases we are able to piece together the outlines of the equal protection intent requirement, against which we can measure the sufficiency of plaintiffs' complaint. *Washington v. Davis* involved a suit by a rejected black applicant for a position as an officer in the Washington, D.C. police force. The plaintiff challenged the validity of the qualifying examination, claiming that it had the effect of excluding a disproportionate number of black applicants and thus that it violated the Fifth Amendment, 42 U.S.C. § 1981 and D.C.Code § 1–320. The lower court had applied Title VII's job relatedness standard to the equal protection claim, and the Supreme Court reversed, holding that both a purpose to discriminate and a discriminatory effect must be shown in order to make out an equal protection violation:

> Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. It is also not infrequently true that the discriminatory impact—in the jury cases for example, the total or seriously disproportionate exclusion of Negroes from jury venires—may for all practical purposes demonstrate unconstitutionality because in various circumstances the discrimination is very difficult to explain on nonracial grounds. Nevertheless, we have not held that a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution.

426 U.S. at 242, 96 S.Ct. at 2048. By requiring proof of intent or purpose, the Court perpetuated the distinction between de facto and de jure discrimination. *See, Keyes v. School Dist. No. 1*, 1973, 413 U.S. 189, 205, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548.

The Court held in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 1977, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450, that absent proof of discriminatory purpose, plaintiffs, a nonprofit corporation interested in constructing a low-income housing development and a prospective minority tenant of that development, had not established an equal protection claim against the Village for refusing to rezone a parcel of land to permit low-income, residential housing. Noting that any investigation into intent or purpose "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," 429 U.S. at 266, 97 S.Ct. at 564, the Court listed at 266–68, 97 S.Ct. 555, a nonexclusive set of factors relevant to that inquiry: (1) the disproportionate impact of official action, (2) the historical background of the particular decision, (3) the specific sequence of events leading up to the decision, especially any abrupt, unjustified shift in normal procedure, and (4) the legislative or administrative history of the decision. The Court's opinion hinted, without elaboration, that in rare cases, where a clear pattern of discrimination is proved, the inquiry might turn solely on the nature of the discriminatory effect. In most cases, the effect is only a starting point for a more careful, and necessarily ad hoc, analysis.

Following *Keyes, Davis* and *Arlington Heights*, an important question remained unanswered: whether the intent standard could be satisfied by proof of a discriminatory impact reasonably foreseeable at the time the challenged policy was implemented, i. e., by a so-called "objective intent", *see, Dayton Board of Education v. Brinkman*, 1976, 433 U.S. 406, 421, 97 S.Ct. 2766, 53 L.Ed.2d 851 (Stevens, J., concurring); *Washington v. Davis, supra,* 426 U.S. at 253, 96 S.Ct. 2040 (Stevens, J., concurring); *Hart v. Community School Bd. of Educ.,* 2 Cir. 1975, 512 F.2d 37, 50; *Oliver v. Michi-*

---

1. The complaint in this case, to which the defendants' motions pertain, was filed on February 5, 1976, approximately four months before the earliest of the three Supreme Court decisions.

gan *State Board of Education*, 6 Cir. 1974, 508 F.2d 178, 182, *cert. denied*, 1975, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449; *Feeney v. Comm. of Mass.*, D. Mass.1978, 451 F.Supp. 143, 146, 147, *rev'd*, —— U.S. ——, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), or whether proof must meet the higher standard of demonstrating a subjective discriminatory motivation, *see*, *United States v. City of Chicago, supra*, at 435; *Soria v. Oxnard School Dist.*, 9 Cir. 1973, 488 F.2d 579, *cert. denied*, 1974, 416 U.S. 951, 94 S.Ct. 1961, 40 L.Ed.2d 301; *Feeney, supra*, at 152 (Murray, J., dissenting). The Court's June 5, 1979 decision in *Personnel Admin. of Mass. v. Feeney*, —— U.S. ——, 99 S.Ct. 2282, 60 L.Ed.2d 870, resolves that question—in favor of requiring subjective motivation—and proposes a general framework for analyzing the problem.

In *Feeney*, a woman challenged the constitutionality of the Massachusetts veterans preference statute, which gave veterans an absolute preference for civil service positions. Two of the three judges on the three-judge district court accepted plaintiff's argument that the statute discriminated on the basis of sex in violation of the Equal Protection Clause. In so doing, they both adopted, in separate opinions, a version of *Davis* "intent" that required only a reasonably foreseeable discriminatory impact, at least where the unequal effect was as inevitable as it was in that case. *Id.*, at 147, 151; *see*, *id.*, at 147, n. 71. The Supreme Court reversed, reasoning that without proof that the statute was enacted with a view to denying women positions because of their sex there could be no violation of the Fourteenth Amendment.

■ The *Feeney* Court suggested a twofold inquiry when, as in the instant case, a statute or policy is neutral on its face:

> The first question is whether the . . classification is indeed neutral in the sense that it is not gender-based [or racially-based]. If the classification itself, covert or overt, is not based upon gender [or race], the second question is whether the adverse effect reflects invidious gender-based [racially-based] discrimination.

> . . . In this second inquiry, impact provides an "important starting point" . . . but purposeful discrimination is "the condition that offends the Constitution."

—— U.S. at ——, 99 S.Ct. at 2293. In connection with the first factor as applied to the instant case, plaintiffs nowhere allege that any of the practices and policies of which they complain—the job eligibility list, Pltffs' Comp., ¶ 27; the application form, ¶ 30; the examination for promotion to official service jobs, ¶ 31; the "insular" recruitment system, ¶ 32; or the appointment system for filling provisional, temporary or emergency vacancies, ¶ 34—are either racially discriminatory on their face or are employed by the state defendants as a "pretext" for racial discrimination. —— U.S. at ——, 99 S.Ct. 2282. Nor is this a case in which the discriminatory impact that plaintiffs allege "could not be plausibly explained on a neutral ground . . ." —— U.S. at ——, 99 S.Ct. at 2294, in which case the Supreme Court suggests that "impact itself would signal that the real classification made by the law was in fact not neutral." *Id.* Here, plaintiffs themselves offer a racially neutral explanation: the thrust of their complaint is that the state defendants participate with the city defendants in a system that allocates jobs on the basis of patronage, friendship and economic and political influence with the consequence of excluding minorities. *See*, e. g., Pltffs' Comp., ¶ 34.

The issue then depends on the second prong of the *Feeney* case's twofold analysis, whether plaintiffs adequately allege that the state defendants intentionally discriminated on the basis of race. Plaintiffs challenge a number of employment practices at the PWD, but only in connection with CETA-funded jobs do they allege purposeful racial discrimination. In paragraph 8, the complaint identifies plaintiff Milton Lightfoot, Jr. and states that during his employment with the PWD as a CETA-funded employee, "he was discriminated against in connection with working conditions and promotional possibilities because

he was black" and that "[h]e was fired because he was black". Paragraph 35 generally alleges that "on information and belief, a number of such minority CETA employees have been discharged by the Boston Public Works Department after relatively short terms of employment because of their race and for other unlawful reasons, all in violation of the CETA Act." Although the language of both of these paragraphs does allege racially motivated discrimination, the complaint nowhere suggests that the state defendants, officials of the Civil Service Commission, were in any way connected with the city defendants' management of the CETA program; or that there was a relationship between the state defendants and discrimination with respect to CETA-funded jobs in particular. For this reason, neither paragraph 8 nor paragraph 35 states a claim against the state, as contrasted with the municipal, defendants upon which relief can be granted. *See, O'Brien v. DiGrazia*, 1 Cir. 1976, 544 F.2d 543, 546 n. 3.

Plaintiffs' remaining allegations stress the discriminatory effect of defendants' policies and practices and point out the ways in which those policies operate to produce the disparate impact. One could also conclude from a liberal reading of these allegations that the disparate impact was reasonably foreseeable at the time the challenged practices were first instituted. However, none of the allegations suggests that the state defendants adopted an employment policy or practice at least in part because of its adverse effect on minorities. Thus, the sufficiency of plaintiffs' complaint against the state defendants turns on whether *Keyes, Davis* and subsequent cases require an allegation of subjective motivation or whether foreseeability together with a discriminatory effect is enough.

In *Feeney* the Supreme Court rejected the foreseeability standard in favor of one focusing upon subjective motivation:

> The appellee's ultimate argument rests upon the presumption, common to the criminal and civil law, that a person intends the natural and foreseeable consequences of his voluntary actions. . .

. . . . .

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. . . It implies that the decision-maker, . . selected or reaffirmed a particular course of action at least in part "because of", not merely "in spite of" its adverse effects upon an identifiable group. Yet nothing in the record demonstrates that this preference for veterans was originally devised or subsequently re-enacted because it would accomplish the collateral goal of keeping women in a stereotypic and predefined place in the Massachusetts Civil Service.

—— U.S. at ——, 99 S.Ct. at 2295–96;[2] *accord, Columbus Board of Ed. v. Penick,* —— U.S. ——, 99 S.Ct. 2941, 61 L.Ed.2d 666, 1979 (by implication), stating, "disparate impact and foreseeable consequences, without more, do not establish a constitutional violation." Furthermore, the First Circuit Court of Appeals employed a similar reading of the intent requirement in *Des Vergnes, supra,* holding that a claim based on 42 U.S.C. § 1981 must allege that the challenged official action was "racially motivated." 601 F.2d at 15–16.

Both *Feeney,* —— U.S. at ——, 99 S.Ct. 2282 and *Des Vergnes,* —— U.S. at ——, 99 S.Ct. 2941, also make clear that, at least when a plaintiff challenges the conduct of an institution or group, he need only

---

**2.** It seems significant that, in its comprehensive definitions of the requirement of "discriminatory purpose" in the *Feeney* and previous cases, the Supreme Court has not used the word "motive", although the dissenter in the lower court used the word repeatedly. *Feeney v. Comm. of Mass.,* D.Mass.1978, 451 F.Supp. 143, 155–56. The reasons for this omission may include the complexity of the purpose issue, which seems

plainly broader than motive, and sharp differentiation of the issue from mens rea in criminal cases where the standard instruction to juries is, "Intent and motive should never be confused. Motive is what prompts a person to act, or fail to act. Intent refers only to the state of mind with which the act is done or omitted." 1 Devitt & Blackmar, Federal Jury Practice and Instructions, 3rd Ed., 395, § 14.11.

allege that a discriminatory purpose has been one of the motivating factors, not that it has been a necessary factor.[3] However, no matter how liberally we read the allegations, the complaint in this case fails to allege even this much. Hence, pursuant to Rule 12(b)(6), Fed.R.Civ.P., we dismiss the private plaintiffs' claims based on the Thirteenth and Fourteenth Amendments, 42 U.S.C. §§ 1981 and 1983, and Title VI, 42 U.S.C. § 2000d, with leave to amend within thirty days from the date of this opinion. *See, City of Milwaukee v. Saxbe,* 7 Cir. 1976, 546 F.2d 693, 705.

## II. *Standing to Sue*

█ State defendants also contend that the complaint should be dismissed insofar as it seeks to redress discrimination in official service positions on the ground that plaintiffs lack standing to raise these claims. Deciding a motion to dismiss for lack of standing, the court accepts all the material allegations of the complaint as true and construes the complaint in favor of the complaining party. *Warth v. Seldin,* 1974, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343.

According to plaintiffs' complaint, there appear to be two general occupational categories in the Boston Public Works Department: the labor service and the official service. The labor service jobs tend to require fewer skills and less training than the official service positions, and salary levels are generally lower in the labor service. Whereas the labor service is filled from an eligibility list which includes the names of all individuals who have applied for the positions in order of the date of their applications, access to official service positions involves some form of testing.

Of the three individual plaintiffs, two have applied for labor service positions in 1973, and although their names appear on the eligibility list, they have not yet received employment. The third plaintiff was hired as a streetcleaner, a labor service position, pursuant to the Federal Comprehensive Employment and Training Act (CETA), 29 U.S.C. §§ 801 *et seq.* He was later terminated allegedly due to his poor attendance, chronic tardiness and poor attitude. Although he was ordered to be reinstated after a formal CETA hearing, he has not yet been reinstated nor has he received any permanent, non-CETA position with the Public Works Department; his name does appear on the eligibility list. None of the three plaintiffs have applied for or have occupied positions in the official service category. Plaintiffs do allege, however, that had plaintiffs been hired into labor service positions in 1973, they would now be qualified for one or more official service jobs and would have had an opportunity to be promoted to at least one of those positions.

Plaintiffs also seek to represent a class pursuant to Fed.R.Civ.P. Rule 23(b)(2), a class which includes all past, present and future minority employees of the Boston Public Works Department, minority persons who were deterred from applying for employment because of the alleged discriminatory practices. This class appears to encompass employees in, applicants for, and would-be applicants for official service as well as labor service positions. As heretofore noted, the class has not yet been certified.

█ Standing doctrine encompasses two distinct components: the constitutional core requirement of injury-in-fact mandated by Article III and a periphery of prudential doctrines that address concerns variously characterized as whether the interest asserted by the plaintiff is "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Association of Data Processing Service Organizations, Inc. v.*

---

**3.** We need not decide whether evidence that a discriminatory purpose merely entered into the decision to undertake the challenged activity, standing alone, is sufficient to prove an equal protection violation in the face of evidence that precisely the same decision would have been made had there been no discriminatory animus. *See, Arlington Heights, supra,* at 270 n. 21, 97 S.Ct. 555; *cf., Mt. Healthy School Dist. Bd. of Education v. Doyle,* 1977, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471.

*Camp,* 1969, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184, or as whether the plaintiffs are ·"proper proponents of the particular legal rights on which they base their suit." *Singleton v. Wulff,* 1976, 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826. Defendants concede that plaintiffs satisfy the prudential requirements; the interests they assert are ones that the various statutory provisions they invoke were designed to protect. Moreover, because of the importance of private enforcement in the Title VII scheme, individual plaintiffs are accorded standing to the extent permitted by the constitutional requirements of Article III; standing is not to be limited by doctrines not of constitutional dimension. *See, Trafficante v. Metropolitan Life Ins.,* 1972, 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415; *Gray v. Greyhound Lines, East,* 1976, 178 U.S.App.D.C. 91, 545 F.2d 169, 175–76; *Hackett v. McGuire Brothers, Inc.,* 3 Cir. 1971, 445 F.2d 442, 446.

■ The crucial issue then is whether plaintiffs' allegations are sufficient to meet the constitutional core standing requirements. In general terms, Article III requires that a plaintiff have such a "personal stake in the outcome of the controversy" so as to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Baker v Carr,* 1962, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663. Specifically, plaintiff's injury or threat of injury must be both real and immediate, not conjectural or hypothetical. *O'Shea v. Littleton,* 1973, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674. It must be a distinct and palpable harm suffered by the plaintiff himself, not merely a general interest held by plaintiff and a large segment of the public. *See, Warth v. Seldin,* 1974, 422 U.S. 490, 501, 502, 508, 95 S.Ct. 2197, 45 L.Ed.2d 343; *O'Shea v. Littleton, supra,* 414 U.S. at 494–95, 497, 94 S.Ct. 669. The injury need not be economic; it may be psychological or aesthetic so long as it otherwise conforms to these constitutional limitations. *See, Sierra Club v. Morton,* 1972, 405 U.S. 727, 734–738, 92 S.Ct. 1361, 31 L.Ed.2d 636; *Data Pro-*

*cessing Service, supra,* at 154, 90 S.Ct. 827, 25 L.Ed.2d 184.

■ Moreover, a federal court can only redress injury "that fairly can be traced to the challenged action of the defendant," *Simon v. Eastern Ky. Welfare Rights Org.,* 1976, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450. The alleged harm must flow from the defendant's actions, or there must be a substantial probability that granting plaintiff's requested relief will remove plaintiff's alleged injury. *Id.* at 45, 96 S.Ct. 1917; *Warth v. Seldin, supra,* 422 U.S. at 504, 95 S.Ct. 2197. The causational chain, however, may form a quite attenuated connection between defendant's actions and plaintiff's injury. *See, United States v. SCRAP,* 1973, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254. *But cf., Simon v. Eastern Ky. Welfare Rights Org., supra,* 426 U.S. at 45, n. 25, 96 S.Ct. 1917.

Much of the confusion in the briefs of both parties results from failing to distinguish between two separate, yet closely related, issues: first, whether any of the plaintiffs as individuals have standing in the Article III sense to complain of discrimination in official service positions, and if not, whether the presence of class allegations require a different analysis. These questions will be treated separately.

A. *Standing as Individuals*

In order properly to analyze the first issue, we must· ascertain the scope of plaintiffs' challenge of employment practices in the official service job category. Although it is not crystal clear from the complaint, it appears that plaintiffs have launched what is called an "across-the-board attack" on official service discrimination. *See generally, Piva v. Xerox Corp.,* N.D.Calif., 1976, 70 F.R.D. 378, 385–86. In particular, they complain about recruitment, hiring, training, and promotion of minorities. The complaint leaves some doubt as to whether the training and promotion of which they complain is limited to training within labor service and promotion from labor service to official service or whether plaintiffs also

complain of training and promotion within the official service itself. In view of the scope of the requested relief, however, it appears that plaintiffs challenge intra-category as well as inter-category promotional opportunities, and training in the official service as well as in the labor service. The challenged actions of the defendants, therefore, include recruitment and hiring into, and training and promotion within the official service category and promotion between labor service and official service.

■ In order to have standing to assert their recruitment and hiring claims, plaintiffs must allege concrete and perceptible injury suffered as a result of defendants' discriminatory recruitment and hiring. Yet they nowhere allege that they have applied for employment in the official service, nor that they would be qualified for official service employment had they applied. Failure to apply is not always fatal to standing. In *International Brotherhood of Teamsters v. United States,* 1977, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396, a Title VII case, the Supreme Court held, at 364–68, that relief could be awarded to nonapplicants if they were able to prove that but for the discrimination of which they complain, they would have applied for the positions. Presumably, in order to have suffered injury by being deterred from applying, the nonapplicant would also have had to have been qualified for the desired position. Although the Court in *Teamsters* did not analyze the issue expressly in standing terms, the holding has obvious implications for the standing question.

Failure to apply, moreover, will not defeat standing if the nonapplicant had no knowledge of the availability of the position because of the discriminatory recruitment practices he challenges. *See, Curran v. Portland Super. Sch. Committee, etc.,* D.Maine, 1977, 435 F.Supp. 1063, 1071–72. *Curran* distinguishes *Jackson v. Dukakis,* 1 Cir. 1975, 526 F.2d 64, a Title VII case

holding that plaintiff, who had never applied for employment, lacked standing since he never placed himself in a position to suffer any injury from defendants' actions, on the ground that evidence in *Jackson* appeared to indicate that the plaintiff was aware of the employment possibilities. 526 F.2d at 65. Furthermore, the *Jackson* decision has been substantially eroded by *Teamsters, supra.* See generally, *Curran, supra,* at 1072.

■ In both *Teamsters, supra,* and *Curran, supra,* plaintiffs were qualified for the positions which they sought but for which they had not applied. Plaintiffs in the instant case make no mention of their qualifications for official service jobs. Paragraph 9 of plaintiffs' complaint even implies that plaintiffs may not now be qualified. Plaintiffs also do not allege that they were deterred from applying because of defendants' discriminatory hiring practices, nor that they had no personal knowledge and continue to have no knowledge of official service job openings. The absence of these allegations is fatal to plaintiffs' individual standing to challenge discrimination in official service recruitment and hiring.[4]

■ Plaintiffs also do not have individual standing to complain of discrimination in inter-category promotions, i. e., promotions from labor service to official service, or intra-category promotions and training in official service. Although they do allege that had it not been for the discriminatory hiring and termination practices in connection with labor service employment they would now be in a position to advance into official service jobs, they allege no injury suffered on account of a discriminatory promotion decision. In addition, they plainly cannot and do not allege any injury due to intra-category promotional discrimination or discriminatory allocation of official service training opportunities. The statistical evidence may indicate that plaintiffs *might* have encountered dis-

---

4. Plaintiffs might have standing to challenge the lack of training programs for official service positions if a training program might have qualified them for an official service job and lack of training prevented them from applying for official service employment. We express no opinion regarding this possibility, since the necessary allegations are absent.

crimination in promotional and training opportunities had they been hired into labor service jobs, but probabilities are not substitutes for the real, concrete and perceptible injury required by Article III. *See, Warth v. Seldin, supra.* Plaintiffs' complaint alleges injury resulting from discriminatory hiring practices in the labor service jobs category and their standing is limited to the scope of that injury. Whether plaintiffs may have suffered injury in connection with alleged official service discrimination depends on a series of hypothetical assumptions, which together cannot support individual standing. Therefore plaintiffs have individual standing only with respect to discriminatory hiring practices in the labor service.

### B. *Standing as Representatives of a Class*

Plaintiffs also seek to represent a class of employees, applicants, and would-be applicants, a class which includes those who have suffered discrimination in official service jobs. Plaintiffs' class allegations shift the proper focus of inquiry from questions of standing to questions of class certification.

 Because of the close similarity between the commonality and typicality requirements of Rule 23(a), Fed.R.Civ.P., and the injury in fact requirements of standing doctrine, the role of standing in the class context is a complex and highly confused issue. *See, e. g.,* 3B Moore's Federal Practice ¶ 23.04[2]. No matter how narrow a view they may have of the proper scope of a class action under Title VII, few courts have confined the class to only those individuals who have suffered injury of precisely the same kind as the named plaintiff. *See, e. g., Hill v. Western Elec. Co., Inc.,* 4 Cir. 1979, 596 F.2d 99, 102; *Senter v. General Motors Co.,* 6 Cir. 1976, 532 F.2d 511, 524–25, *cert. denied,* 1976, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150; *Beasley v. Griffin,* D.Mass.1979, 81 F.R.D. 114, 116–17; *White v. Gates Rubber Co.,* D.Colo.1971, 53 F.R.D. 412, 413–15. Title VII lawsuits are often, by their very nature, class suits, involving class-wide wrongs; hence it is im-

proper to limit an individual plaintiff to class relief on only those particular claims with respect to which he has satisfied the technical standing requirements. *See, East Texas Motor Freight v. Rodriguez,* 1977, 431 U.S. 395, 405–06, 97 S.Ct. 1891, 52 L.Ed.2d 453. On the other hand, it is equally improper to permit a plaintiff to represent a class with which he shares only a very remote interest. *Rodriguez, supra,* at 403–04, 97 S.Ct. 1891; *Hill, supra,* at 101–02; *Kulkarni v. Nyquist,* N.D.N.Y.1977, 446 F.Supp. 1269. The focus of inquiry must be on the nexus between the individual claims of the named plaintiff and other, different, claims of class members in order to determine if he can adequately represent the class.

 Even though a plaintiff has not met standing requirements with respect to all his claims, he may still seek class-wide relief, in our opinion, provided he has personal standing with respect to at least one substantial claim, *cf., Rodriguez, supra,* and *Jackson v. Dukakis,* 1 Cir. 1975, 526 F.2d 64, 67, and provided a class action is otherwise appropriate under Rule 23(a). Since plaintiffs in this case have standing to claim discrimination in labor service hiring, the dispositive issue on the motion to dismiss is whether plaintiffs can represent the subclass of all past, present and future minority employees of, applicants for, and would-be applicants for official service positions. On the basis of the complaint alone and the limited factual record, it would be plainly improper for us to decide even this narrow aspect of plaintiffs' motion for class certification in the context of a motion to dismiss for failure to state a claim. *Cf., Satterwhite v. City of Greenville, Tex.,* 5 Cir. 1977, 557 F.2d 414.

The degree of nexus between plaintiffs' individual claims regarding labor service discrimination and discrimination in the official service category is a question of fact depending, for example, on the difference in types of jobs and the divergence of interest in possible remedies. These factual issues are best resolved by a hearing in the context of a motion for class certification,

not by a motion to dismiss based on the slim allegations contained in the complaint.[5] Therefore, we deny defendants' motion to dismiss plaintiffs' claims with respect to official service discrimination without prejudice to their renewing their objections in the context of plaintiffs' motion for class certification.

### III. *Revenue Sharing Claim Against State Defendants*

■■■ As the third and final part of their motion to dismiss, the state defendants argue that since the complaint does not allege the state's receipt of revenue sharing funds used either in whole or in part to fund any program or activity with respect to which allegations of discrimination have been made, the defendants are excepted from the reach of Section 1242(a)(1) of the Revenue Sharing Act by Section 1242(a)(2). This argument applies to the revenue sharing claims of both the private plaintiffs and the United States, and the motions are, therefore, directed to the relevant portions of both complaints. Because the state defendants have offered an affidavit and supporting material in connection with their motions, we will treat defendants' motions as for summary judgment and, so characterized, they are denied.

Section 1242(a)(1) of the Revenue Sharing Act, 31 U.S.C. § 1242(a)(1) contains the Act's basic non-discrimination provision. In relevant part, it prohibits discrimination under any program of a state government or unit of local government, "which government or unit receives funds made available under subchapter I of this chapter." Section 1242(a)(2) then creates an exception to the requirements of Section 1242(a)(1), viz., "where any state government or unit of local government demonstrates, by clear and convincing evidence, that the program or activity with respect to which the allegation of discrimination has been made is not

funded in whole or in part with funds made available under subchapter I of this chapter."

The obvious import of this statutory scheme is to impose on the plaintiff the burden of proving that the defendant receives revenue sharing funds and that discrimination takes place in one of the defendant's programs or activities. The plaintiff having carried this burden, it is then left to the defendant to demonstrate by clear and convincing evidence that the defendant's revenue sharing funds do not in any way finance the tainted program or activity.

■■■ Defendants' motions for summary judgment are denied because there are genuine issues of material fact regarding the state defendants' liability under the Revenue Sharing Act. The November 10, 1977 affidavit of Michael Carroll, Chief Planner of the Massachusetts Office of Federal/State Resources, and attachments thereto demonstrate that the state of Massachusetts has received revenue sharing funds. And plaintiffs' complaint alleges a connection between the state Civil Service Commission and various of the discriminatory employment practices of the PWD, a relationship that the state defendants have not disputed. The state Civil Service Commission is surely a "program or activity of a state government," and the complaint alleges that plaintiffs and the class they seek to represent have suffered discrimination "under" the state Civil Service Commission by its involvement with the PWD. 31 U.S.C. § 1242(a)(1). Thus, the burden shifts to the defendants under § 1242(a)(2).

■■■ The state defendants contend that there is no genuine issue of fact concerning whether revenue sharing moneys received by the state fund "in whole or in part" any of the operations of the state Civil Service Commission and that this clear evidence of

---

5. On the face of the complaint, plaintiffs would seem to have slim chance of representing official service discriminatees. The skills required for labor service jobs appear to be quite different from those required for the official service. Plaintiffs are probably not now qualified for official service, and there is no evidence in the complaint that they have applied for any of these positions. The modes of discrimination in official service jobs might differ significantly from the patterns of discrimination in the labor service.

non-funding precludes a finding of liability by virtue of the exception in § 1242(a)(2)(A). We disagree. Defendants' evidence is far from clear. Defendants rely on the affidavit of Michael Carroll, *supra*, and the attached Actual Use Reports for the periods 1972–73, 1973–74, 1974–75, and 1975–76. Prior to July 1, 1975, funds were used for a variety of purposes, including a category denominated "General Government." It is impossible from the Actual Use Reports to determine whether any funds were allocated to the state Civil Service Commission. Mr. Carroll's allegation that "[f]unds received by the Commonwealth under the Revenue Sharing Act have never been applied to funds *directly*, in whole or in part, the Civil Service Commission or the Division of Personnel Administration . . . ." 11/10/77 Affidavit, *supra* at ¶ 2 (emphasis added), states a legal conclusion which is neither supported nor contradicted by the attached Reports. We are mindful that the congressional intent was to include in the nondiscrimination provision only programs *directly* funded by revenue sharing moneys, House Conf.Rep. No.94–1720, reprinted in 1976 U.S.Code Cong. & Admin.News pp. 5188, 5200, but defendants' evidence simply does not constitute "clear and convincing" proof that funds were not so allocated during the period July 1, 1972 through June 30, 1975. Discrimination in a funded program in the past is surely relevant, since it is within the power of a federal court to order repayment of funds that have been used in the past to finance a tainted program. 31 U.S.C. § 1242(g); House Conf.Rep., *supra*, 1976 U.S.Code Cong. & Admin.News, at p. 5204; *see, United States v. City of Chicago*, 7 Cir. 1977, 549 F.2d 415, 439–42, *cert. denied*, 1977, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155.

Even the Actual Use Report for July 1, 1975 to June 30, 1976, which indicates that revenue sharing funds were allocated to debt service reserve used to make interest payments on state bonds, is not unambiguous. It is impossible to ascertain from an inspection of this document whether or not revenue sharing funds were applied to retire debt obligations used in any way to finance the building occupied by the state defendants. Hence there is a genuine issue of material fact concerning the allocation of revenue sharing funds directly to the state defendants' operations and thus summary judgment would be improper. *See also, Gatreaux v. Romney*, 7 Cir. 1972, 457 F.2d 124.

■ Even if summary judgment were appropriate, dismissal of these state defendants from the lawsuit at this time would not. The act explicitly authorizes a court to grant as relief "any temporary restraining order, preliminary or permanent injunction, or other order, as necessary or appropriate to insure the full enjoyment of the rights described in this section, including the suspension, termination, or repayment of funds . . . ." 31 U.S.C. § 1242(g). Ordering the suspension, termination, or repayment of revenue sharing funds is plainly not the outer limit of the court's remedial power; we may issue an order remedying the unlawful employment practices themselves. *See*, House Conf.Rep., *supra*, 1976 U.S.Code Cong. & Admin.News, at 5205.

■ Since the complaints allege close involvement of the state defendants with the challenged PWD employment practices, the presence of state defendants is necessary to the formulation of complete and fully effective relief for both the private plaintiffs and the United States. The state Civil Service Commission, for example, could frustrate the implementation of a final decree in this case by refusing to cooperate with alterations in the PWD hiring system. For this reason, the state defendants are parties needed for just adjudication who should be joined, if feasible. Rule 19(a)(1), Fed.R.Civ.P. And joinder here would not deprive this court of jurisdiction over the subject matter of this action. *See*, 3A Moore's Federal Practice ¶ 19.07–1[1]. Hence, joinder of the state defendants is feasible and would be proper for the limited purpose of fashioning an effective decree. *See, Eldredge v. Carpenters 46 Northern California, Etc.*, N.D.Calif.1977, 440 F.Supp.

506, 518–27; *Hart v. Community School Bd. of Brooklyn*, E.D.N.Y.1974, 383 F.Supp. 699, 758, *app. dis.*, 2 Cir. 1974, 497 F.2d 1027; *Morgan v. Hennigan*, D.Mass.1974, 379 F.Supp. 410, 477, *aff'd*, 1 Cir. 1974, 509 F.2d 580, *cert. denied*, 1975, 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449; *cf. Held v. Missouri Pacific Railroad Company*, S.D.Tex.1974, 373 F.Supp. 996, 999–1000.

IV. *Conclusion*

Based on the foregoing analysis we dismiss private plaintiffs' claims against the state defendants, Personnel Administrator of the Massachusetts Division of Personnel Administration; Chairperson of the Massachusetts Civil Service Commission; and members of the Massachusetts Civil Service Commission, insofar as they are based on the Fourteenth Amendment and 42 U.S.C. § 1983, the Thirteenth Amendment and 42 U.S.C. § 1981, and Title VI, 42 U.S.C. § 2000d. The private plaintiffs' Title VII claims and the claims of both the private plaintiffs and the United States based on the Revenue Sharing Act, 31 U.S.C. § 1242(a), remain. Finally, a determination of the appropriate scope of the class will await resolution of plaintiffs' motion for class certification.